Mark J. Werksman, Esq. (State Bar No. 120767)
Mehrunisa Ranjha, Esq. (State Bar No. 318399)
**WERKSMAN JACKSON & QUINN LLP**
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942

Attorneys for Defendant
ELAD GABER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>vs.<br><br>ELAD GABER,<br><br>   Defendant. | **No. 2:14-CR-00472-1**<br><br>**DEFENDANT ELAD GABER'S SENTENCING MEMORANDUM**<br><br>**Date: October 8, 2021**<br>**Time: 10:00 a.m.** |

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    FACTS RELATING TO MR. GABER . . . . . . . . . . . . . . . . . 4

    B.    FACTS OF THE INSTANT OFFENSE. . . . . . . . . . . . . . . . . 8

III.  MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . 8

    A.    SECTION 3553(A) FACTORS CONCERNING THE
        HISTORY AND CHARACTERISTICS OF THE
        DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    MR. GABER'S HISTORY AND
            CHARACTERISTICS ARE MITIGATING . . . . . . . . . 9

            a.    EVIDENCE OF MR. GABER'S AUTISM
                DIAGNOSIS AND LENGTHY HISTORY
                OF MENTAL HEALTH ISSUES IS
                MITIGATING . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.    INCARCERATION WILL HAVE A
            DETRIMENTAL EFFECT ON MR. GABER'S
            TREATMENT AND MENTAL HEALTH . . . . . . . . . 13

        3.    MR. GABER'S INCARCERATION WOULD
            IMPACT INNOCENT FAMILY MEMBERS. . . . . . . 14

    B.    SECTION 3553(A) FACTORS CONCERNING THE
        NEED FOR THE SENTENCE IMPOSED . . . . . . . . . . . . . . 15

        1.    THE SERIOUSNESS OF THE OFFENSE . . . . . . . . 16

        2.    THE NEED TO PROVIDE JUST PUNISHMENT
            AND PROMOTE RESPECT FOR THE LAW . . . . . . 17

        3.    THE NEED TO PROTECT THE PUBLIC . . . . . . . . 18

            i.    THERE IS A LOW LIKELIHOOD OF
                RECIDIVISM . . . . . . . . . . . . . . . . . . . . . . . . 18

    C.    THE TYPES OF SENTENCES AVAILABLE. . . . . . . . . . . . 19

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1

## TABLE OF AUTHORITIES

2

**PAGE(S)**

**U.S. SUPREME COURT CASES**

Atkins v. Virginia
    536 U.S. 304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

California v. Brown
    479 U.S. 538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Gall v. United States
    552 U.S. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15

Penry v. Lynaugh
    492 U.S. 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Roper v. Simmons
    543 U.S. 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Tapia v. United States
    564 U.S. 319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Booker
    543 U.S. 220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**FEDERAL CASES**

Simon v. United States
    (E.D.N.Y. 2005) 361 F. Supp. 2d 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

United States v. Adelson
    (S.D.N.Y. 2006) 441 F. Supp. 2d 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

United States v. Cox
    (D. Maine 2011) 796 F. Supp. 2d 221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. McBride
    (6th Cir. 2006) 434 F.3d 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Ricker
    (8th Cir. 2020) 983 F.3d 987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Schroeder
    (7th Cir. 2008) 536 F.3d 746 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Spigner
    (8th Cir. 2005) 416 F.3d 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Williams
    (7th Cir. 2009) 553 F.3d 1073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Wilson
    (D. Utah 2005) 350 F. Supp. 2d 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-ii-

**PAGE(S)**

**FEDERAL STATUTES**

18 U.S.C. § 2422(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 3582(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**U.S. SENTENCING GUIDELINES**

U.S.S.G. § 2E1.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 2G1.3(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 2G1.3(b)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 2G1.3(b)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 5G1.1.(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. § 5H1.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**OTHER SOURCES**

Christine N. Cea, Autism and the Criminal Defendant (2014) 88 St. John's

L. Rev. 495, 502–503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 12

Marc R. Woodbury-Smith et al., *A Case-Control Study of Offenders with High
Functioning Autistic Spectrum Disorders*, 16 J. FORENSIC PSYCHIATRY &
PSYCHOL. 747, 747–48 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

U.S. Sentencing Commission, Measuring Recidivism: The Criminal History
Computation of the Federal Sentencing Guidelines, 12 (May 2004),
available at http://www.ussc.gov/Research/Research_Publications/
Recidivism/200405_Recidivism_Criminal_History.pdf. . . . . . . . . . . . . . . . . . . 19

-iii-

1  **Mark J. Werksman, Esq. (State Bar No. 120767)**
2  **Mehrunisa Ranjha, Esq. (State Bar No. 318399)**
   **WERKSMAN JACKSON & QUINN LLP**
3  **888 West Sixth Street, Fourth Floor**
4  **Los Angeles, California 90017**
   **Telephone: (213) 688-0460**
5  **Facsimile: (213) 624-1942**
6
   Attorneys for Defendant
7  ELAD GABER
8
9              UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA
11
12  THE UNITED STATES OF          ) **No. 2:14-CR-00472-1**
13  AMERICA,                      )
                                  ) **DEFENDANT ELAD GABER'S**
14         Plaintiff,             ) **SENTENCING MEMORANDUM**
                                  )
15     vs.                        )
                                  ) **Date: October 8, 2021**
16  ELAD GABER,                   ) **Time: 10:00 a.m.**
17         Defendant.             )
                                  )
18                                )
19  _____)

20  **TO THE HONORABLE PHILIP S. GUTIERREZ, UNITED STATES**
    **DISTRICT COURT JUDGE, AND ASSISTANT UNITED STATES**
21  **ATTORNEY CATHARINE RICHMOND:**

22       Defendant, Elad Gaber ("Mr. Gaber"), by and through his counsel of record,

23  Werksman Jackson & Quinn LLP, hereby files his Sentencing Memorandum. Mr.

24  Gaber's position is based upon the factual basis established pursuant to his plea

25  agreement, the Pre-Sentence Investigation Report ("PSR"), Disclosed

26  Recommendation Letter, the attached Memorandum of Points and Authorities, all

27  letters and documents filed herewith, and upon any oral argument that may be

28
                                      1

1   presented at the sentencing hearing pursuant to Federal Rule of Criminal

2   Procedure, Rule 32(c)(1).

3

4   DATED: September 24, 2021               Respectfully submitted,

5                                           WERKSMAN JACKSON & QUINN LLP

6

7

8                                           Mark J. Werksman
9                                           Mehrunisa Ranjha
10                                          Attorneys for Defendant
                                            Elad Gaber
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# I.
## INTRODUCTION

On May 7, 2021, Mr. Gaber pleaded guilty to a single count of Use and Attempted Use of a Facility of Interstate Commerce to Induce a Minor to Engage in a Criminal Sexual Activity, in violation of 18 U.S.C. § 2422(b). The offense conduct underlying this charge occurred on or about June 16, 2010. (Dkt. 1.)

On August 30, 2021, Probation filed its PSR and Disclosed Recommendation Letter. Probation calculated a base offense level of twenty-eight by applying United States Sentencing Guideline ("U.S.S.G.") § 2G1.3(a)(3). (PSR ¶ 30.) Probation than added two levels for the "specific offense characteristic" of "knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct," pursuant to U.S.S.G. § 2G1.3(b)(2)(A). (PSR ¶ 31.) Another two-level increase was also applied for the "use of a computer . . . to persuade, induce, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct," pursuant to U.S.S.G. § 2G1.3(b)(3)(A). (PSR ¶ 32.) Finally, Probation credited Mr. Gaber with a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. §§ 2E1.1(a) and (b). (PSR ¶¶ 39, 40.) Therefore, Probation ultimately calculated a total offense level of 29, which corresponds to a guideline range of 87 to 108 months imprisonment with Mr. Gaber's criminal history category of I. (PSR ¶ 41.) However, because the offense at issue—18 U.S.C. § 2422(b) is subject to a mandatory minimum sentence of ten years imprisonment, Probation recommended the minimum term of ten years, followed by a lifetime term of supervised release.

As set forth below, the factors identified by Probation, including Mr. Gaber's autism diagnosis, long-documented history of mental illness, acceptance of responsibility, and complete lack of criminal history, as well as other 18 U.S.C. § 3553(a) factors, are significantly mitigating. Moreover, the attached report from Mr. Gaber's psychologist, Dr. Hy Malinek, sheds further light into the complex

3

psychological factors that contributed to Mr. Gaber's anomalous involvement in criminal acts, how he has worked to deal with those underlying factors, how much remorse he feels for his past actions, and how dedicated he is to making amends. (See Psychological Report of Dr. Hy Malinek, attached as Exhibit A, under seal; see also Past Psychological Reports, attached as Exhibit B, under seal.) The impact of a lengthy custodial sentence upon Mr. Gaber's elderly mother, an innocent third party, is another factor the Court should consider when setting an appropriate sentence. Finally, and very significantly, it is important for the court to consider that the conduct charged in this case occurred in June 2010—over eleven years ago. As set forth below, in the decade since these acts occurred, Mr. Gaber has made tremendous progress towards rehabilitation and has been punished heavily since then. He has served time in jail and spent years in home confinement. He has also actively sought mental health treatment, and successfully complied with all other court-ordered conditions such as completing community service and staying away from use of the internet. Thus, in sentencing Mr. Gaber, the court should also consider that Mr. Gaber has already spent the past decade being monitored and punished for his conduct and involvement in the instant case. In consideration of these significant mitigating factors, the Court should sentence Mr. Gaber to the minimum sentence of ten years.

## I.
## STATEMENT OF FACTS

### A.    FACTS RELATING TO MR. GABER

Elad Gaber was born on June 28, 1982, in Jerusalem. (PSR ¶ 53.) His mother, Hava Glickstein, was a Biologist and his father, Larry Gaber, was a Geologist. (PSR ¶ 55.) In 1984, when Mr. Gaber was two years old, the family moved to the United States to allow Mr. Gaber's father to enroll in a doctoral program at Ohio State University. (Ibid.) However, in 1988, Mr. Gaber's parents got divorced and Hava returned to Israel with Mr. Gaber to be close to their

4

1   extended family and network of support. (PSR ¶ 56.) While Mr. Gaber's father
2   eventually also returned to Israel three years later, he relocated to a different city
3   while Mr. Gaber continued to live in Jerusalem with his mother. (Ibid.)

4       Beginning in Middle School, Mr. Gaber began experiencing difficulties and
5   struggling with his studies. (PSR ¶ 58.) These issues became significantly worse in
6   high school where Mr. Gaber was unable to make social connections, keep up with
7   his studies, or maintain an interest in extracurricular activities. (PSR ¶ 58.) After
8   participating in extracurricular activities such as ninjitsu and volleyball for several
9   years at the behest of his parents, Mr. Gaber began suddenly quitting these
10  activities. (PSR ¶ 59.) When he was criticized in ninjitsu class by the instructor one
11  day, Mr. Gaber quit on the spot. (Ibid.) Ms. Glickstein decided to seek out the
12  professional help of psychologists to figure out the cause of Mr. Gaber's increasing
13  disengagement in social, academic, and extracurricular activity. (PSR ¶ 58.) One
14  psychologist, examining Mr. Gaber when he was fourteen, noted that Mr. Gaber
15  was highly intelligent (with an IQ of 135) but suffered from learning disabilities.
16  (See Report of Dr. Avinoam Tadmoor, Exhibit B.) Mr. Gaber was also diagnosed
17  as dyslexic by another psychologist. (Letter of Hava Glickstein, attached as Exhibit
18  C, p. 2.)

19      Despite receiving several professional mental health evaluations beginning
20  at a young age, Mr. Gaber was never correctly diagnosed and did not end up
21  receiving the help he needed. As a result, his mental health and social engagement
22  declined severely over time. (PSR ¶ 59.) Ultimately, in the eleventh grade, Mr.
23  Gaber dropped out of school altogether and "retreated to his room." (Exhibit C, p.
24  1.) He did not have any friends in the real world and was instead, entirely engaged
25  in the world of the internet, and computer and video games. (Ibid.)

26      At the age of eighteen, Mr. Gaber reported for national military service—as
27  is required for all Israeli adults. After just two weeks, however, Mr. Gaber was
28  discharged from service after being declared "medically unfit" due to his mental

5

1  health issues. (PSR ¶ 60; see also Military Exemption Letter, attached as Exhibit

2  D.) After being declared unfit for compulsory military service—a major stigma in

3  Israeli society—Mr. Gaber's condition deteriorated and he retreated from society

4  even further. (Ibid.) Other than visiting his father's new family and spending time

5  with his two half-sisters on occasion, or visiting his aunt's house, Mr. Gaber

6  seldom left the house or saw anyone other than his mother. (See Letter of Michal

7  and Sharon Gaber, attached as Exhibit E; Letter of Esther Zitronblat, attached as

8  Exhibit F.) He had no friends and totally isolated himself from the real world.

9  Completely engrossed in the virtual world of the internet and video games, Mr.

10  Gaber even began neglecting his physical wellbeing, often failing to eat for long

11  periods of time, and maintaining very poor personal hygiene. (Exhibit C, p. 2; PSR

12  ¶ 61.) His mother writes: "There was a huge gap between his very high intellectual

13  abilities and his behavior and lack of social skills. He could not plan [for] the

14  future, could not cope with the real world, and was totally dependent on me for the

15  actual needs of real life." (Ibid.) "Real life [was] too frightening for him. He

16  avoided large groups of people and noisy places." (Ibid.) At the same time, Mr.

17  Gaber refused to seek help or take any medications to address his worsening

18  mental health and social isolation. (Ibid.)

19  　　　In 2011, Mr. Gaber was arrested by Israeli authorities for the conduct

20  charged in the instant case. (PSR ¶ 63.) He was ultimately sentenced to jail and

21  house arrest by the Israeli Court and ordered to perform community service. (Ibid.)

22  In addition, the court ordered Mr. Gaber to participate in a year of mental health

23  counseling and therapy. (Ibid.) Mr. Gaber successfully complied with all

24  conditions set by the Israeli court and exceeded the requirements for therapy and

25  community service. (Ibid.) After completing his one year of community service at

26  the Tisch Family Zoological Gardens in Jerusalem, Mr. Gaber decided to continue

27  volunteering at the zoo for another two years. (Ibid.) While his original duties at

28  the zoo only included cleaning aquarium tanks, cleaning outdoor areas, and

supervising the behavior of visitors around the fish feeding and touch pond, "due to his motivation and high level of performance, Mr. Gaber soon received full responsibility for maintaining all visitor areas and the water quality of the touch pond." (See Letter from Zoo Curator, Noam Werner, attached as Exhibit G.) Mr. Gaber's work at the zoo required a great deal of one-on-one contact with a diverse array of visitors and he handled this contact very well. (Ibid.) He was also well liked by other zoo staff and became friendly with them. Mr. Gaber's three years working at the zoo had a highly positive impact on his mental health and wellbeing. (Exhibit C, p. 2.)

The court-ordered therapy also had a very positive impact on Mr. Gaber. Meeting once a week with a psychologist for a year allowed him to begin figuring out some of the psychological factors that led to his involvement in the instant offense. Mr. Gaber was initially diagnosed as schizophrenic by the psychologists he consulted in 2011 and 2012. While this diagnosis fit some of Mr. Gaber's characteristics, it did not seem accurate to Mr. Gaber and his family. Eventually, after several additional consultations and specialist appointments, Mr. Gaber met with a diagnostic specialist who diagnosed him with having autistic traits. (Exhibit B, Report of Dr. Atalya Winters.) In 2018, Mr. Gaber sought out additional opinions at the esteemed Sheba Medical Center's Clinic for Adults on the Autism Spectrum. At this clinic, Mr. Gaber was diagnosed with Autism Spectrum Disorder, with a severity level of 2 out of 3. (See Exhibit B, Reports of Dr. Epstein Tamir and Dr. Livne Yeara.) Following this, Mr. Gaber was deemed 50% disabled (due to his mental health issues) and 100% unable to work by the Israeli government, and awarded monthly disability payments. (Disability Eligibility Letter, attached as Exhibit H; PSR ¶ 71.)

In December 2017, Mr. Gaber was arrested in Israel in anticipation of extradition to the United States. (PSR ¶ 64.) He was then released and placed on house arrest in Israel, with location monitoring through an ankle bracelet. (PSR ¶

7

65.) He was also ordered to refrain from using the computer and internet during this period of home confinement. Once again, during his period of home confinement and supervision, Mr. Gaber complied diligently with all conditions of his confinement and did not violate any court orders. Ultimately, in January 2021, Mr. Gaber was extradited to the United States and has been in custody since that time. While progress in the instant case was initially stalled due to the COVID-19 pandemic, Mr. Gaber accepted responsibility and entered a guilty plea at the earliest possible opportunity.

Over his time in custody, Mr. Gaber has maintained an avid interest in art and has been drawing prolifically while in custody. (See Mr. Gaber's drawings, attached as Exhibit I.)

## B.   FACTS OF THE INSTANT OFFENSE

For purposes of sentencing, Mr. Gaber relies only on the facts from the Plea Agreement.

## III.
## MEMORANDUM OF POINTS AND AUTHORITIES

Title 18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. Under § 3553, factors considered to make this determination include: 1) the nature and the circumstances of the offense and the history and characteristics of the defendant; 2) the purposes of sentencing; 3) the kind of sentences available, 4) the United States Sentencing Guideline calculation; 5) pertinent policy statements; 6) the need to avoid unwarranted sentence disparities; and 7) the need to provide restitution. 18 U.S.C. § 3553(a). In considering § 3553(a) factors, a court may consider formerly discouraged factors or facts that would not have met pre-Booker standards for departures. See United States v. McBride, 434 F.3d 470, 476 (6th Cir. 2006) ("Now, because the Guidelines are no longer mandatory and the district court need only consider them along with its analysis of the section 3553(a) factors

... many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court–with greater latitude–under section 3553(a)."); see also United States v. Booker, 543 U.S. 220, 301 (2005) (Stevens, J., dissenting) ("[T]here can be no 'departure' from a mere suggestion.").

As set forth below, all § 3553(a) factors, considered together, warrant a sentence substantially less than the Sentencing Guideline range.

## A. SECTION 3553(A) FACTORS CONCERNING THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

One of the primary 18 U.S.C. § 3553(a) factors to consider is the nature and circumstances of the offense and the history and characteristics of Mr. Gaber. As one court noted, "Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006). As set forth below, Mr. Gaber's history and characteristics, particularly the effects of his previously undiagnosed and untreated autism, are mitigating.

### 1. MR. GABER'S HISTORY AND CHARACTERISTICS ARE MITIGATING

In the instant case, the history and characteristics of Mr. Gaber militate towards a lower sentence.

#### a. EVIDENCE OF MR. GABER'S AUTISM DIAGNOSIS AND LENGTHY HISTORY OF MENTAL HEALTH ISSUES IS MITIGATING

The United States Supreme Court has instructed that "'evidence about [a] defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" Penry v. Lynaugh, 492 U.S.

9

302, 319 (1989), abrogated on other grounds by <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), quoting <u>California v. Brown</u>, 479 U.S. 538, 545 (1987) (O'Conner, J., concurring). The Court has also noted that a defendant's "Immaturity at the time of the offense conduct," whether attributable to age or a mental disability "is not an inconsequential consideration." <u>Gall</u>, 552 U.S. at 58 (quoting <u>Roper v. Simmons</u>, 543 U.S. 551, 569 (2005)). Certainly, therefore, courts have taken into consideration and treated as a significantly mitigating factor a defendant's diagnosis of autism. <u>See, e.g.</u>, <u>United States v. Williams</u> (7th Cir. 2009) 553 F.3d 1073, 1085 (remanding back to District Court for resentencing in consideration of autism as a "mental disability"); <u>United States v. Ricker</u> (8th Cir. 2020) 983 F.3d 987, 998, <u>as corrected (Dec. 29, 2020)</u>, <u>cert. denied</u> (May 24, 2021).

As set forth in the attached psychological report of Dr. Malinek, "Mr. Gaber has for years been diagnosed with a rather unique and severe form of Autistic Spectrum Disorder" and "has demonstrated chronic and debilitating deficits in relating to others, was socially isolated, could not adjust to regular schools, was not accepted to the Israeli Army (like every 18-year-old in Israel), and has required multiple evaluations and special treatment for years." (<u>Exhibit A</u>, p. 2.) Dr. Malinek notes that "many individuals with ASD seek sexual and romantic relationships, yet that that [sic] their ability to develop and maintain appropriate romantic and sexual relationships is frequently greatly hampered by their deficits in social and communications skills, difficulties in understanding nonverbal or subtle cues, and defective mentallization (meaning being able to understand one's own mental states, e.g. emotions, desires, cognitions)." (<u>Id.</u> at p. 1.) It is also relevant that "many individuals with ASD do not receive sexual education that takes their behavioral peculiarities into consideration." (<u>Ibid.</u>) Dr. Malinek notes that some or all of these factors played a role in Mr. Gaber's engagement in the

10

criminal acts charged herein. Mr. Gaber's engagement in criminal acts was likely a result of "sexual preoccupations and frustrated needs for intimacy and connection which he has never been able to meet and did not know how to create." (Ibid.) Thus, Dr. Malinek concluded that Mr. Gaber's actions were not the result of "a sexual perversion" such as pedophilia; rather, they were "a direct and problematic outgrowth of a unique autistic spectrum disorder." (Id. at p. 3.) Indeed, Mr. Gaber's sexually inappropriate connections with individuals on the internet "became the primary avenue to feel a sense of connection for this socially isolated, inadequate and anxious individual." (Ibid.)

Dr. Malinek's conclusions and observations regarding the impetus for Mr. Gaber's entirely uncharacteristic engagement in criminal activity are consistent with the prevailing scholarship regarding how and to what extent "certain clinical features of autism can predispose an autistic individual to criminal offending."[1] "General factors that may make an autistic individual vulnerable to offending include 'poor school achievement, truancy, aggressive behaviour,' and factors directly linked to autistic characteristics such as 'poor social understanding or circumscribed interests; difficulties in adjusting to the diagnosis; and the impact of social exclusion.'"[2] Scholars have also noted that "[a]nother characteristic of autism that might make an individual vulnerable to committing a crime is the potential difficulty of feeling empathy for others."[3] Thus, because criminal

---

[1] Christine N. Cea, Autism and the Criminal Defendant (2014) 88 St. John's L. Rev. 495, 502–503.)

[2] Ibid.

[3] Ibid.

11

offending is often associated with poor empathy skills such as "impaired recognition of the emotional expression of fear," lacking empathy can make it difficult for an autistic individual to perceive another person's distress.[4]

Psychologists have also noted that "Although there is no direct link between autism and sex crimes, characteristics of autism may also predispose an autistic individual to sexual crimes."[5]

> Autistic individuals have been found to have 'lower levels of sexual experience, sexual, and social behaviour, and less understanding of privacy.' A person with a pervasive developmental disorder 'may have difficulty indicating his or her interest toward another person in a socially acceptable way, which may lead to touching or kissing a stranger.' Autistic individuals may struggle to distinguish boundaries. For example, an individual with Asperger's may look at child pornography but have no sense of the harm it is causing the child. Possible explanations for this misunderstanding include that autistic individuals may perceive themselves as younger than they are, may not understand societal notions, or simply lack empathetic ability. Further, it has been found that the 'line' between child pornography and legal pornography can be blurred for autistic individuals, who may be 'completely unaware they have crossed a moral and legal line.'[6] (internal citations omitted)

As noted by Dr. Malinek, an inability to perceive and understand the harm he was causing to the victims, resulting from his disability, likely played a role in Mr. Gaber's actions. (Exhibit A, p. 3.) While Mr. Gaber might intellectually have understood that what he was doing was wrong, he

---

[4] Marc R. Woodbury-Smith et al., *A Case-Control Study of Offenders with High Functioning Autistic Spectrum Disorders*, 16 J. FORENSIC PSYCHIATRY & PSYCHOL. 747, 747–48 (2005).

[5] Cea, *supra*, note 1, at 502–503.

[6] Ibid.

12

likely could not comprehend the extent to which his actions were wrong, and the harm he was causing the victims. Certainly, autism makes it more difficult for defendants, like Mr. Gaber, to properly identify or empathize with the emotions of others. As such, his uncontroverted and severe mental illness and the way in which it affected his ability to fully perceive and understand the pain he was causing victims, should be taken into account.

In sum, the evidence of Mr. Gaber's severe autism, the debilitating effect it had on his life and ability to form normal interpersonal relationships, and the ways in which this disability ultimately led to his involvement in criminal acts, are all mitigating factors that this Court should consider in choosing an appropriate sentence.

### 2.    INCARCERATION WILL HAVE A DETRIMENTAL EFFECT ON MR. GABER'S TREATMENT AND MENTAL HEALTH

As set forth above, Mr. Gaber has been diagnosed with autism spectrum disorder. However, this diagnosis was only identified after Mr. Gaber was first arrested for the conduct charged in this case and ordered to receive mental health counseling. Since that time, Mr. Gaber and his family have taken considerable and extraordinary efforts to identify the mental health issues that caused his aberrant actions in the instant case, and to work to address these issues. It was only after consulting various experts around Israel, and receiving varying diagnoses, that Mr. Gaber was ultimately correctly diagnosed with Autism Spectrum Disorder.

As demonstrated by the attached letters from Mr. Gaber's family and psychologists, after Mr. Gaber began receiving regular counseling and mental health treatment, his mental health and overall social engagement improved significantly. Moreover, his volunteer work at a local zoo in Jerusalem also played a major role in this recovery. After initially beginning this work as a court-ordered

13

condition, he volunteered to remain working at the zoo for two more years. He was able to successfully interact with visitors and other workers at the zoo, even forming healthy friendships with other workers and volunteers. (See Exhibit G.) Thus, despite having access to a computer and internet between 2012 and 2018, he never re-offended. After 2018, he successfully complied with the court's order to refrain from using computers and the internet.

Mr. Gaber's actions in the decade since his initial arrest for the instant conduct, shows the significant progress in his rehabilitation and recovery he was able to make through regular mental health counseling and social engagement. As noted by Dr. Malinek, Mr. Gaber "now fully understands that what he had done was wrong and hurtful. He appears to have understood it years ago given that he stopped his criminal activity online completely once he was apprehended, and has never resumed it even though he had an opportunity to do so while living in the community and having access to a computer between 2012 and 2018." (Exhibit A, p. 2.) In light of this, lengthy incarceration, thousands of miles away from his network of support, with no ability to form healthy interpersonal relationships, and limited or no access to specialized mental health counseling will only hamper rather than promote Mr. Gaber's continued recovery and rehabilitation. Thus, the Court should sentence him to the minimum term of imprisonment.

### 3. MR. GABER'S INCARCERATION WOULD IMPACT INNOCENT FAMILY MEMBERS

In considering Mr. Gaber's history and characteristics, a relevant consideration is the impact incarceration would have on family members. See United States v. Schroeder, 536 F.3d 746, 756 (7th Cir. 2008). At the outset, it is imperative to note the type or degree of circumstances which warrant a variance under § 3553(a). In Gall v. United States, 552 U.S. 38, 47 (2007), the Supreme Court explained that a court does not need to find "extraordinary circumstances" to

14

find that a variance is warranted under one of the § 3553(a) factors. Because family circumstances are relevant under 18 U.S.C. § 3553(a), a defendant need not to meet the stringent requirements for a departure under § 5H1.6, which requires that the family circumstances be "extraordinary." See id.; see, e.g., United States v. Cox, 796 F. Supp. 2d 221, 224 (D. Maine 2011). Instead, the court "must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 39. Thus, this Court can consider the impact that Mr. Gaber's incarceration would have on innocent family members, regardless of whether that impact would be considered "extraordinary." Ibid.

Here, Mr. Gaber's elderly mother has been his primary caretaker for the entirety of his life, and he has been entirely dependent upon her to meet all his basic needs. As she states in her letter, she is now "72 years old and the only one who can help him after serving his sentence." (Exhibit C, p. 4.) She also states: "when sentencing an autistic person, the court sentences the mother as well, since an autistic person is totally dependent on her. The mother who was struggling very hard all her life to raise a different child, all by herself." (Ibid.) Thus, the Court should consider this plea of leniency from Ms. Glickstein, as well as the impact that Mr. Gaber's lengthy incarceration in foreign country, many thousands of miles away from his home in Israel will have upon Ms. Glickstein and other family members. Finally, the Court should also consider the fact that Ms. Glickstein is essential to Mr. Gaber's eventual reintegration into society, his continued recovery, and his rehabilitation. A lengthy sentence, therefore, in addition to having a negative impact on Mr. Glickstein, will also be counterintuitive to promoting Mr. Gaber's recovery and rehabilitation.

**B.   SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED**

The next factors under § 3553(a) concern the need for a particular sentence. The mandatory principle of § 3553 is a limiting one, the sentence must be

*"sufficient, but not greater than necessary,"*[7] to satisfy the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (emphasis added).

Courts across the country have recognized that they must honor this parsimonious provision. See, e.g., Carty, 520 F.3d at 991; United States v. Spigner, 416 F.3d 708, 711 (8th Cir. 2005).

## 1. THE SERIOUSNESS OF THE OFFENSE

The instant case undoubtedly involves a serious offense and the sentence imposed should unquestionably be proportionate to the seriousness of this crime. However, as demonstrated by the Plea Agreement, Mr. Gaber has fully accepted responsibility for the instant offense. Moreover, as demonstrated by the multiple psychological reports submitted to the Court, after having gone through extensive counseling, Mr. Gaber fully understands and realizes the seriousness of his offense and feels remorse for his actions. Mr. Gaber has also demonstrated a deep commitment to understanding the cause of his aberrant behavior and ensuring that he never violates the law again. This is demonstrated by his extensive efforts to obtain a correct diagnosis for his mental health issues and to receive treatment. Further, his background, complete lack of any prior criminal history, and numerous

---

[7] The Adelson court noted "necessary" is the "operative word." Adelson, 441 F. Supp. 2d at 515.

16

psychological factors show that the instant offense is an aberration. Therefore, the sentence should be no greater than the minimum required by statute.

## 2. THE NEED TO PROVIDE JUST PUNISHMENT AND PROMOTE RESPECT FOR THE LAW

18 U.S.C. § 3553(a) mandates that the court consider the need for the sentence imposed to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). In determining whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that "fits the crime." Simon v. United States, 361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005). The punishment should not be unreasonably harsh under all of the circumstances of the case. See United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005) (citing S. Rep. No. 98-225, at 75-76 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3258–59.)

Mr. Gaber has already suffered enormously as a result of this conviction. As noted above, Mr. Gaber was originally apprehended by Israeli authorities in 2011. He was ordered by an Israeli court to serve time in jail and ordered to serve a period of home confinement. He was later again placed under home arrest for two years while awaiting extradition to the United States. In addition, over the past decade, he has also been required to complete a number of other court-ordered conditions, such as completing year of volunteer work and therapy, and refraining from accessing the internet throughout his two years of home confinement while awaiting extradition. Mr. Gaber has successfully completed all of these requirements and abided by all court orders. This shows, not only, that Mr. Gaber has a deep respect for the law and can comply with any court orders, it also shows that he has already spent the better part of the past decade restricted by and making amends for his actions in the instant case. Accordingly, in arriving at a just sentence, this Court should take into account all that Mr. Gaber has already done and the many ways in which his life has already been severely restricted for a decade as a result of his actions.

### 3.     THE NEED TO PROTECT THE PUBLIC

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant. As noted above, this conviction is an aberration—Mr. Gaber has no prior criminal history, and his actions since the commencement of this case show that society is not in need of protection from Mr. Gaber.

Mr. Gaber is convicted of committing the instant offense on or about June 16, 2010, more than a decade ago. Over the past decade, Mr. Gaber has been in full compliance with the terms of his pre-trial release and has had no additional incidents—even when he was able to move freely in the community and to access the internet. Thus, Mr. Gaber has demonstrated that he will be compliant with any court-imposed supervision and can be closely monitored during any period of supervised release. There is nothing to suggest that Mr. Gaber poses a danger to society.

### i.     THERE IS A LOW LIKELIHOOD OF RECIDIVISM

Further, in determining whether the length of the sentence is adequate to protect the public from further crimes of the defendant, it is also relevant to determine a defendant's likelihood of recidivism.

As noted by Dr. Malinek, Mr. Gaber is not "diagnosable with a sexual perversion" and is not "presently at a risk of re-offense." (Exhibit A, p. 2.) Moreover, Mr. Gaber's "score on the CPORT (0) does not designate him as a high risk offender, and has been associated with low recidivism rates (2 percent in five years)." (Id. at p. 5.) This is particularly significant given Mr. Gaber's complete lack of a criminal history, background, age,[8] and the active psychological treatment

---

[8] See Simon v. United States, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) (granting non-Guideline sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of

1 he has sought and pursued over the past decade. Thus, it is extremely unlikely he
2 would recidivate and this Court should consider Mr. Gaber's low risk of recidivism
3 in determining his sentence.

4 ## C.  THE TYPES OF SENTENCES AVAILABLE

5 Another factor to consider under 18 U.S.C. § 3553 is the kinds of sentences
6 that are available. 18 U.S.C. § 3582(a) provides that, "the court, in determining
7 whether to impose a term of imprisonment, and, if a term of imprisonment is to be
8 imposed, in determining the length of the term, shall consider the factors set forth
9 in § 3553(a) to the extent that they are applicable, recognizing that imprisonment is
10 not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §
11 3582(a). 18 U.S.C; see also Tapia v. United States, 564 U.S. 319, 332 (2011)
12 (holding that Section 3582 "precludes sentencing courts from imposing or
13 lengthening a prison term to promote an offender's rehabilitation"). § 3553(a) also
14 requires consideration of the "kinds of sentences available." 18 U.S.C. §
15 3553(a)(33). Thus, under § 3582, this Court should consider what term of
16 imprisonment is appropriate in the instant case to meet the goals of sentencing and
17 to promote Mr. Gaber's rehabilitation and eventual reintegration into society.

18 Here, pursuant to 18 U.S.C. § 2422(b), the minimum term of imprisonment
19 for this offense is 10 years in custody and the maximum term is life. See also
20 U.S.S.G. § 5G1.1.(b) ("Where a statutorily required minimum sentence is greater
21 than the maximum of the applicable guideline range, the statutorily required
22 minimum sentence shall be the guideline sentence."). Moreover, the statutory

23
24
25 defendants under the age of 21.) Studies have shown that "recidivism rates decline
relatively consistently as age increases," from 35.5% under age 21 to 9.5% over
26 age 50. See U.S. Sentencing Commission, Measuring Recidivism: The Criminal
27 History Computation of the Federal Sentencing Guidelines [hereinafter Release 1]
28 12 (May 2004), available at http://www.ussc.gov/Research/Research_Publications/
Recidivism/200405_Recidivism_Criminal_History.pdf.

minimum term of supervised release is five years, and the maximum is lifetime supervision. As set forth above, Mr. Gaber's actions in this case were entirely attributable to his (at that time) undiagnosed and untreated autism, the severe social isolation that resulted from that disorder, and Mr. Gaber's inability to form normal and healthy interpersonal attachments with others. However, in the decade plus since those events, Mr. Gaber has sought out and received specialized treatment to identify and address these issues, actively given back to his community through volunteer work, made tremendous progress in his mental health and interpersonal relationships with others and most importantly, has not reoffended. Thus, the court should consider imposing the minimum term of imprisonment and the minimum term of supervised release following imprisonment.

## IV.
## CONCLUSION

For the foregoing reasons, Mr. Gaber respectfully requests that the Court consider whether a lower sentence meets the purposes of § 3553(a) based on the unique circumstances of this case.

DATED: September 24, 2021

Respectfully submitted,

WERKSMAN JACKSON & QUINN LLP

Mark J. Werksman
Mehrunisa Ranjha
Attorneys for Defendant
Elad Gaber

20