```
                   UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)



UNITED STATES OF AMERICA,     )  CASE NO: 2:14-CR-00472-PSG
                              )
              Plaintiff,      )          CRIMINAL
                              )
     vs.                      )     Los Angeles, California
                              )
ELAD GABER,                   )     Friday, October 8, 2021
                              )
              Defendant.      )     (10:18 a.m. to 11:46 a.m.)
```

                            SENTENCING

              BEFORE THE HONORABLE PHILIP S. GUTIERREZ,
                 CHIEF UNITED STATES DISTRICT JUDGE

**APPEARANCES**:

For Plaintiff:              CATHERINE RICHMOND, ESQ.
                           AUSA-Office of the U.S. Attorney
                           312 North Spring Street
                           Los Angeles, CA 90012

For Defendant:             MARK J. WERKSMAN, ESQ.
                           Werksman Jackson & Quinn
                           888 West Sixth Street
                           Suite 400
                           Los Angeles, CA 90017

Interpreter:               Alexander Shapiro (On Stand-by)

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          W. Hernandez

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Los Angeles, California; Friday, October 8, 2021; 10:18 a.m.**

2                      **(Call to order)**

3          **THE CLERK:**  Calling item three, Criminal 14-472,

4    *United States of America versus Elad Gaber*.  Counsel, please

5    state your appearances.

6          **MS. RICHMOND:**  Good morning, Your Honor.  Catharine

7    Richmond on behalf of the United States.  Joining me at counsel

8    table is FBI Special Agent Tanaz Korami.

9          **MR. WERKSMAN:**  Good morning, Your Honor.  Mark

10   Werksman appearing on behalf of Mr. Gaber, who's present in

11   custody.

12          And, Your Honor, I should indicate that a Hebrew

13   language interpreter, Mr. Alex Shapiro, is on video.  The last

14   two times we've appeared in court my client did have an

15   interpreter standing by as backup.  He does speak good English,

16   and I communicate with him in English all the time, and I can

17   represent to the Court that I do believe he speaks good

18   English.  But he says that it causes a reverb in his ears, he

19   hears double, and he'd prefer not to use an interpreter.  Your

20   Honor, I believe that that's probably okay because he does

21   understand more or less everything I've said to him, I think.

22   But I just want the Court to know the status.

23          **THE COURT:**  All right.  So if an interpreter's

24   needed, he'll -- you'll let me know.  If an interpreter is

25   needed, he will -- he'll let me know.

1          **MR. WERKSMAN:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Let's --

3          **MR. WERKSMAN:**  Thank you.

4          **THE COURT:**  -- go ahead and proceed to the lectern

5   for the moment.

6          **MR. WERKSMAN:**  Us?  Yeah.

7          **THE COURT:**  Yes.

8          **MR. WERKSMAN:**  Thank you.  Both of us?

9          **THE COURT:**  Yes, please.

10          **MR. WERKSMAN:**  Okay.  Come, Elad.  Why don't you just

11   stand right there?  That's fine.

12          **THE COURT:**  This is the time for sentencing.  I have

13   read and considered the Presentence Report with a disclosure

14   date of August 30th, 2021, and the addendum filed on October

15   4th, 2021.  I've also read and considered the Defendant's

16   sentencing memorandum along with Exhibits A and B.  I've also

17   read the Government's sentencing position, along with letter

18   submissions.

19          Mr. Werksman, have you had enough time to read the

20   Presentence Report and review it with your client?

21          **MR. WERKSMAN:**  Yes, I have.  By the way, Your Honor,

22   may we remove our masks at the lectern so we can -- it's easier

23   to speak?

24          **THE COURT:**  No.

25          **MR. WERKSMAN:**  No, okay.

4

1          **THE COURT:**  Did you explain the contents of the

2   report to him?

3          **MR. WERKSMAN:**  Yes, I did.

4          **THE COURT:**  Do you have any concerns about his

5   ability to understand the report?

6          **MR. WERKSMAN:**  No.

7          **THE COURT:**  Mr. Gaber, did you get the Presentence

8   Report?

9          **THE DEFENDANT:**  Yes.

10         **THE COURT:**  Did you read it?

11         **THE DEFENDANT:**  Yes.

12         **THE COURT:**  Do you need any more time to read it?

13         **THE DEFENDANT:**  No.

14         **THE COURT:**  Did your attorney explain it to you?

15         **THE DEFENDANT:**  Yes.

16         **THE COURT:**  Did you understand?

17         **THE DEFENDANT:**  Yes.

18         **THE COURT:**  Mr. Werksman, you may be heard.

19         **MR. WERKSMAN:**  Thank you.  Your Honor, Mr. Gaber is a

20  39-year-old Israeli national who committed these offenses for

21  which he stands here today between around June of 2010 and

22  February of 2011, almost 11 years ago.  Your Honor, my client

23  did some horrible things and he caused a lot of pain for a lot

24  of young ladies, some of whom I believe are here today and will

25  eventually address the Court when the Government makes its

1    presentation.  The pain that they suffered, the humiliation,

2    and the harm, undisputed, undenied, for which my client will

3    forever regret and for which he apologizes.

4            And so we're not here to contest the acts he

5    committed, which were awful, or the pain he inflicted on the

6    young ladies at the time who were unparticipating in,

7    unwillingly, this so-called sextortion scheme.

8            We're here today, Your Honor, to ask for mercy and a

9    guideline sentence, as recommended by the Probation office,

10   which did recommend a sentence of I believe 87 to 95 months.

11   Because of a ten-year mandatory minimum, and because of the

12   plea agreement in which we are allowed to ask for a ten-year

13   mandatory minimum and nothing less, I'm asking the Court to

14   impose a ten-year mandatory minimum sentence on Mr. Gaber.

15           Your Honor, Mr. Gaber suffers a severe mental

16   handicap; it's autism disorder.  Dr. Hy Malinek, who's I

17   believe known to this Court, if not known to this particular

18   bench office or is known to these courts in this community, a

19   very well-credentialed expert in sexual deviant, sexual

20   misbehavior, and a psychologist, a forensic psychologist,

21   described what Mr. Gaber suffers as, I'm quoting, "A unique and

22   severe form of autism."  By the way, these are -- this report

23   is filed with our sentencing papers.  I know the Court has seen

24   it.

25           He also opines that this is not a perversion or a

1    paraphilia; this is really driven by this autism disorder.

2         And if I may, Your Honor -- and I'm not speaking

3    through Dr. Malinek, I'm speaking directly to Your Honor from

4    my point of view and from what we have learned as a result of

5    investigating this case and presenting our arguments to the

6    Court.  I believe that Mr. Gaber's autism is a compelling

7    mitigating factor.  And it's not a legal defense to what he

8    did, Your Honor, but it explains in two ways why he did what he

9    did.

10        One is that from very early years he had this autism

11   disorder which made him incapable of reading social queues, of

12   empathizing with other human beings, and of meaningfully

13   engaging in society, such that at the age of 18, when he was

14   inducted to do his mandatory universal military service in

15   Israel, he only lasted two weeks in the Israeli defense forces

16   and then was literally drummed out because he couldn't hack it

17   mentally.  This is a country that's sort of been in a perpetual

18   state of war where the military service is crucial, it's a

19   fabric of society.  A young man who doesn't serve is a pariah

20   to -- just for that reason alone.  And he only lasted two weeks

21   in the Israeli defense forces.

22        He's been diagnosed by other medical and

23   psychological experts in Israel, all of whose reports have been

24   submitted to Your Honor, with having a form of schizophrenia

25   earlier in his life.  But mainly everyone agrees he's severely

1   autistic.

2          So what does this do to him?  It does two things that

3   are relevant to this sentencing hearing and why I believe it's

4   mitigating.  One is his autism drove him out of society and

5   turned him into basically a hermit living in his now 72-year-

6   old mother's apartment, sitting on the internet for his

7   entertainment, amusement, and for his connection to the world;

8   no friends, no meaningful life outside the house, withdrawn

9   from society in his early 20's when he committed these offenses

10   in his mid-twenties, ten, 12 years ago, with no life outside

11   the house because he's severely incapable of interacting

12   outside the home.

13          But more so, Your Honor, and directly mitigating, is

14   that the autism deprived him of the ability to understand how

15   much pain he inflicted on his victims.  And I think it's well-

16   written throughout the reports, as well as we've argued this in

17   the facts of the case, that he engages -- and I know the

18   Court's familiar with the facts and that the Government will go

19   more into those facts, which are basically uncontested, that he

20   would get these girls, teenage girls, young girls, innocent

21   girls who were playing around on the internet, he would ensnare

22   them into a face-to-face where he'd compel them by threats to

23   do horrible sexual acts that they would never otherwise do.

24   And a normal human being like yourself or myself would be

25   appalled.

1           The sight -- and you'll -- I don't know if the

2   Government's going to show clips to Your Honor, they don't --

3   almost don't have to because the conduct is stipulated.  But

4   these girls are -- they're crying, they're afraid, they're

5   traumatized.  You or I would see immediately, oh, my God, we're

6   hurting this person, and we would desist.  If there was any

7   thought for even a second that it was consensual or part of a

8   game or some kind of sexual dialogue, it would be disabused in

9   seconds when a normal human being sees the reaction of this

10  girl.

11          But a person with severe autistic disorder is

12  incapable of recognizing that pain and empathizing with that

13  pain.  Not a legal defense, Your Honor, not a reason why the

14  Court should say, okay, you can go now, we understand, but a

15  reason, Your Honor, why the mandatory minimum sentence is

16  appropriate and not some much lengthier sentence that would

17  basically amount to a life sentence.

18          Your Honor, my client has now been facing these

19  charges in one way or another since early 2011.  It was in July

20  of 2011, almost 12 years ago, when -- 11 years ago, sorry, Your

21  Honor, when he was first arrested by Israeli police because in

22  July of 2011, they received a directive from the FBI saying

23  there's a guy and, you know, we've traced this guy to your

24  country through his ISP doing these horrible things to girls

25  throughout the United States.

1          And so the Israeli police launched an investigation,

2   they arrested him.  He was incarcerated for I believe at that

3   time initially was carcerated (sic) for 17 days.  And then had

4   to do 182 days of community service because the Israeli police

5   discovered addition -- that in addition to the things he was

6   doing that the FBI was investigating, he had also violated the

7   privacy of some neighbors, he'd done some peeping Tom-type

8   stuff, and so he did six months of community service.

9          Then, Your Honor, and these delays are -- just

10  happened.  I'm not casting blame but it just -- it is what it

11  is.  It took three years for the United States government to

12  bring an indictment.  They did so in 2014.

13         So then he gets arrested finally on that indictment

14  in Israel in 2017 and spent 21 days in actual custody.

15         And then he spent the next two years on an ankle

16  bracelet in house arrest while the extradition proceedings

17  played out.  Yes, he resisted extradition.  He was an Israeli

18  citizen.  The Israeli courts are well-equipped to punish people

19  in Israel who do what he did, and he did the things in Israel.

20  And so his legal position was, an appropriate position was, I

21  should stay in Israel and be prosecuted here.  I hope the Court

22  won't hold against him the fact that he resisted extradition

23  for two years.

24         Ultimately he was disgorged and arrested again on or

25  about January 22nd of 2020, about two years ago, 18 months ago.

10

1   Sorry, my math is so bad when it comes to these things; that

2   will be about 21 months ago, and put on a plane and comes here.

3          As you know, Your Honor, we entered into a plea

4   agreement within months.  But because of COVID, it took until

5   this past May to bring him to court.  We would have come to

6   court and entered a guilty plea and this sentencing would have

7   been a year ago if not for COVID.

8          But, Your Honor, my point is that for about ten years

9   he has faced the legal scrutiny, threat of prosecution, and

10  actual prosecution, and is subject to house arrest, community

11  confinement, community service, and actual custody for almost

12  11 years as a result of these crimes which happened ten to 11

13  years ago.  And the passage of time, it's not all his fault.

14  Some of it is a delay in extradition, but it's the passage of

15  time because of the wheels of justice move slowly,

16  international agreements, and the whole extradition process

17  just takes forever.

18         But what we did -- but now what the Court has,

19  though, before him is a 39-year-old man who's very different

20  from the 27-year-old who did those things.  He's proven for 11

21  years that he can stay off the internet, because he has had no

22  access to internet, he's had no crimes or transgressions since

23  he was first arrested on this case in 2011 by police.  He's

24  proven to Your Honor that he can live crime-free, he is not a

25  recidivist offender, he is not an uncurable, irredeemable

1  predator.

2          In fact, he is what I believe the doctors have

3  correctly portrayed him as.  And the letters from his family,

4  you've got letters from aunts, his half-sisters, his mother.

5  He's basically a decent, quiet, withdrawn young man with no

6  history of criminal conduct except for this horrible online

7  life he led, that as I've argued was a result of, sprang from,

8  and generated in some ways by his mental illness.

9          In short, Your Honor, I beg Your Honor not to give

10  him a sentence that will result in him spending decades more in

11  prison.  It's now been so much a part of his life for so many

12  years that if this Court would give him a ten-year-sentence,

13  and he'll obviously be in jail for many, many more years, I

14  believe that would not only be appropriate and fair and just

15  but it would also be consistent with the sentencing guidelines

16  which consider and factor in all these things and actually

17  militate in favor of a lower sentence of eight to nine years.

18  Unless the Court wants me to address any other particular

19  aspect, I'll submit on that.

20          **THE COURT:**  I just wanted -- one of the things that

21  concerns me is, correct me if I'm wrong, but essentially after

22  the sentence, Mr. Gaber will be extradited -- I mean sent back

23  to Israel.  So even if I have a lifetime supervised release,

24  he's going to be unsupervised in Israel.  Isn't that -- that

25  concerns me.

1      **MR. WERKSMAN:**  Your Honor, I'm not an expert in the

2   extradition matters and how it would unfold.  I do know that

3   he's eligible, I believe, superficially he is eligible to be

4   returned to Israel to serve his sentence.  I think there's a

5   treaty provision that requires that he be considered and

6   processed for that.  But once Your Honor imposes sentence, I

7   don't think any of us have any control over whether he is sent

8   back to Israel or the terms and conditions of his post-sentence

9   supervision.

10      Except I can tell you that Israel is very much a

11   first-world nation, it's very much legally, politically bound

12   to the United States.  They have the same morays as these -- as

13   we do in this country, in this jurisdiction.  You wouldn't be

14   sending him back to a country where they're going to brush off

15   these kind of things, as some countries might.  This is Israel,

16   where they put him on six months of house arrest and community

17   supervision for a peeping Tom offense.

18      My guess, Your Honor, and again I can't speak with

19   authority, is that whatever sentence he gets, some time in the

20   -- it'll take a few years but he'll eventually get back to

21   Israel, and then they'll view him as a convicted sexual

22   predator.

23      I do believe, and I -- maybe the Government knows

24   better, that Israel has a similar regimen of sexual

25   registration that we do here, where you're a registered sex

1  offender.  I doubt that this man, given the nature of the case,

2  the publicity it's engendered, the legal battles he already

3  fought on this case in Israel, it's inconceivable to me that

4  he'll go back to Israel and quietly be released to go back to

5  an apartment in Jerusalem.  I think he's going to be on some

6  kind of registration and supervision for the rest of his life.

7  But I can't assure it, of course.

8           **THE COURT:**  All right.  Thank you.

9           **MR. WERKSMAN:**  Thank you, Your Honor.

10          **THE COURT:**  Is there anything, Mr. Gaber, that you

11  wanted to say to the Court before I sentence you today?

12          **MR. WERKSMAN:**  Say you're sorry.

13          **THE DEFENDANT:**  I just want to say that I'm sorry.

14  But I don't want to say -- I can't say anything more because I

15  feel like it's better if I don't.  But I want to say I'm sorry

16  and that's about it.

17          **THE COURT:**  All right.  Thank you.  Mr. Workman

18  (sic), if you'd have a seat with your client.

19          **MR. WERKSMAN:**  Yes, Your Honor.  Thank you.

20          **THE COURT:**  Thank you.

21      **(Pause)**

22          **MS. RICHMOND:**  Good morning, Your Honor.  The

23  Government has prepared a PowerPoint presentation that contains

24  some victims' statements who aren't here today.  Typically the

25  system works perfectly with the Court's external monitors, but

1   due to the fact that the Zoom link is currently being displayed

2   on the monitors, I can't get my PowerPoint to show.  May I

3   respectfully request that the Court Clerk toggle to the lectern

4   input so that I may display my PowerPoint to the Court?

5          **THE COURT:**  Can we do that?

6          **THE CLERK:**  (Indisc.)

7          **THE COURT:**  Okay.

8          **MS. RICHMOND:**  Thank you, Your Honor.

9       **(Clerk/Ms. Richmond confer)**

10      **(Pause from 10:35 a.m. to 10:39 a.m.)**

11         **THE COURT:**  I know that there were some victims that

12  are here that wanted to speak.  Maybe we would proceed that

13  way.  We call IT to see if we can fix the other problem and

14  work that way.

15         **MS. RICHMOND:**  Thank you very much, Your Honor.  I

16  appreciate the Court's patience.

17         Your Honor, we have three victims who would like to

18  allocute to the Court today pursuant to their rights under the

19  Crime Victims' Rights Act.  I have a list of those victims.

20  And in addition, if the Court would allow, there's also a

21  husband of one of the victims who would like to make an impact

22  statement as well.

23         **THE COURT:**  I'll hear from the three victims

24  directly.

25         **MS. RICHMOND:**  Thank you, Your Honor.

1          **THE COURT:**  All right.

2          **MS. RICHMOND:**  The three victims who will speak in

3     this order are Rebecca Pendrell (phonetic), Christy Lockwood

4     (phonetic), and Chelsey Ocean (phonetic).  We'll begin with

5     Rebecca.

6          **THE COURT:**  All right.

7          **MS. PENDRELL:**  Good morning, Your Honor.

8          **THE COURT:**  Good morning.

9          **MS. PENDRELL:**  I will never forget the feeling of my

10    entire body flooding with fear the day I read a Facebook

11    message titled:  "Read this carefully regarding videos of you."

12    This message convinced me that if I did not do as I was told,

13    my -- that my entire life would be ruined.  I was 17 years old

14    at the time.  I was going to do anything to keep my reputation

15    upheld and to keep from getting in trouble for being on my

16    laptop too late at night.  The message stated, all I want is to

17    cam with you one-on-one and to have you for myself this time

18    and to enjoy some more of you.  Little did I understand what

19    "some more" was actually going to entail.

20          The predator behind the message used my teenage

21    foolishness to his benefit.  He blackmailed me into performing

22    unspeakable sexual acts to myself while he recorded me.  He

23    provided me with step-by-step instructions on how I was to

24    dress, how I was to touch myself, and what I was to put inside

25    of my body.  For hours I did as I was told out of fear of a

1   topless photograph of myself being distributed to all of my

2   friends and family.

3          When the abuser finally decided that he was

4   satisfied, he seemed so pleased with this interaction; whereas

5   I spent the following weeks feeling ashamed and disgusted in

6   myself.  For many years I believed that I was worthless.  I was

7   embarrassed to have taken orders from a pedophile.

8          I was a high school senior, a division one college

9   athlete recruit, an honor roll student, a daughter, and a

10  teenager.

11         The predator here in the courtroom today single-

12  handedly robbed me of every ounce of innocence that I had.  He

13  may have not physically put his hand on me but he did however

14  virtually, mentally abuse and rape me with his demands and

15  threats.  I really believed those words when you said, the only

16  way you walk out of -- you walk out clean and unharmed without

17  anyone knowing is if you do what I say.

18         But I'm not here today in shame for the things that

19  you forced me to do.  I am here to stand up for myself and the

20  hundreds of other victims that you abused.  I am here to look

21  you face-to-face after all of these years to tell you that you

22  are the only person who should be ashamed and disgusted in

23  themselves.  I will never understand what goes through the mind

24  of a sick, sadistic, criminal that preys on children, nor do I

25  ever wish to.

1              What happened to me and the hundreds of other victims

2      of this crime of pornography, extortion, and blackmail is

3      completely inexcusable.  I ask that the Defendant receives the

4      maximum sentence for every crime that they have committed.

5              **THE COURT:**  Thank you.

6          **(Pause)**

7              **MS. SPEAKER:**  Do I have to keep my mask on?

8              **THE COURT:**  You may take it off if you wish.

9              **MS. SPEAKER:**  Thank you.  It's stuck on my earring.

10             **THE COURT:**  Could you tell us your initials or your

11     first name, please?

12             **MS. SPEAKER:**  C.L.

13             **THE COURT:**  Thank you.

14             **MS. SPEAKER:**  I'm 27 years old, and 12 years ago I

15     became the victim of blackmail, extortion, and child

16     pornography distribution.  This isn't something I talk about at

17     dinner parties or can relate to with my friends.  I've opened

18     up to those close to me but I've always felt like a burden.  So

19     for the most part I've suffered in silence.  It's difficult to

20     put something you don't talk about into words.  But after more

21     than a decade I'm here to tell you my story and the impact this

22     crime has had on me.

23             In 2009, I was a high school freshman.  When I think

24     of myself at that time, I see a vulnerable young girl, a girl

25     full of innocence, curiosity, and potential, a girl who didn't

1   know any better.  It was at this time that I got my first

2   laptop with a built-in webcam.  The internet was still

3   blossoming and I couldn't wait to explore what was out there in

4   this new, online world.  I stumbled across a site called

5   Stickam, a site that I naively thought was a place to talk with

6   friends or people who liked the same music as me.  I soon

7   learned how untrue that was.

8           Knowing now what was to come breaks my heart for that

9   little 14-year-old girl.  I made what should have been an

10  innocent mistake.  I did something stupid in a chatroom with

11  friends, not realizing that anyone anywhere could be watching

12  as the room was public.  I remember laughing and joking around

13  as kids do.  But now the memory makes my skin crawl.  I feel

14  like an intruder was watching through my bedroom window the

15  whole time, waiting for me to slip up.  What was supposed to be

16  a silly and private moment has ended up following me and will

17  continue to do so for the rest of my life due to the actions of

18  the perpetrator.

19          When I was 16, he finally made contact, and

20  everything changed.  What I didn't know back then was that he

21  had been recording me.  I didn't know he had files upon files

22  of me and hundreds of other underage girls in folders on his

23  computer with my name, photos, and personal information.  I

24  didn't know he would keep my naked photos and upload them

25  online for other pedophiles to do with what they pleased.

1          I still have the messages saved on my computer, and

2    to this day his words cut deep.  I remember reading them, still

3    a kid learning about my body, men, and sex, and not really

4    grasping what was happening to me.  He told me things like, and

5    I quote, "I'll ask to enjoy your smoking body and see a little

6    more of you.  I'm not really here to ruin your life.  I'm just

7    here to enjoy you for a bit.  If you will only please my

8    desire, all will be over quickly as if nothing happened."

9          He told me if I went to the police, it wouldn't

10   matter as he was in another country.  He told me to imagine

11   what would happen if everyone in school had that video.  He

12   went on to demand webcam sex from me in order to keep my photos

13   private.  But when I refused, he acted.  He followed through

14   with his threats and plastered my photos all over the internet.

15   He stole my body from me and gave it away for free.

16          Devastating is an understatement.  He promised if I

17   didn't listen, he would let, "a zillion other internet freaks"

18   see me.  And that's exactly what he did.  I put on a brave face

19   but he scared the Hell out of me.  I was terrified of what else

20   he might do so I kept quiet for years.

21          Eventually the police tracked me down, and I felt

22   like my world crumbled all over again.  It was almost better

23   not knowing the details.  My poor dad had to answer the door,

24   only to be asked to identify his only child and daughter in

25   censored photos and to be told she was a victim of child

1  pornography distribution.  My parents are amazing and

2  supportive people, but the pain this crime has caused them in

3  addition to my own is gut-wrenching.  They feel like they

4  failed and couldn't protect me, and I feel like I let them

5  down.

6          When the police left and continued on with their

7  investigation, I didn't hear anything for years.  But that

8  doesn't mean I didn't think about it.  My mental health

9  severely declined.  I began abusing substances and entered into

10  several abusive relationships.  I was so confused and angry but

11  never fully processed what had happened.  It took me a very

12  long time for me to fully understand what he did.

13          I had to unlearn everything I was taught about sex

14  and my body at such a young age.  I didn't understand that men

15  weren't allowed to take my body from me for a very, very long

16  time.

17          It makes me sick to think about how he exploited me

18  as a child and even sicker knowing what he was planning to do

19  to me if I complied.  The knowledge of what he did to other

20  girls is unbearable.  I shudder to imagine what would have

21  happened if I had gone along with his request.  I don't think I

22  would have survived the aftermath.  I feel like I escaped by

23  the skin of my teeth.

24          It pains me to think about who's looking at my

25  pictures now.  Just last month I came across one of them.  It

1   sent me spiraling into a panic attack, and I spent days crying

2   over it in my apartment, even all these years later.  I did

3   everything I could to get it taken down but I was unsuccessful.

4   The FBI told me the internet is a black hole and I have to

5   accept that I'll never get these pictures back.  This reality

6   and his actions will continue to haunt me for the rest of my

7   life.  There will always be that fear in the back of my mind

8   that someone I know may find them and recognize me.  He may go

9   to jail but he's given me a life sentence of torment.

10          I was eventually diagnosed with complex post-

11   traumatic stress disorder and have undergone a variety of

12   different types of therapy to cope with my trauma.  I suffer

13   from extreme anxiety and panic attacks.  It hurts to think that

14   in my late twenties I'm still forced to confront this trauma

15   and process this event.  It feels like it will never end.

16          Since the case has become active, I've learned more

17   and more sick and twisted details, each revelation ripping the

18   wounds open over and over again.  I've spent thousands of

19   dollars trying to get help and it feels like I will be in

20   therapy for the rest of my life.  It is so incredibly difficult

21   to live with the fact that naked photos of 14-year-old me with

22   my face on them will never be erased.  I don't know if that's

23   something I can just move on from.

24          To conclude, I'd like to quote Paris Hillun

25   (phonetic) who has said that her sex tape leak was like being

1    electronically raped.  She said it was a private moment of a

2    teenage girl not in her right headspace but now everyone was

3    watching.  I cannot think of a better way to describe what he

4    did to me.

5           He didn't need to physically touch me to break me.

6    He promised he would ruin my life if I didn't meet his demands.

7    I didn't, and you did.

8           I now have to continue living with the fact that I'm

9    a victim of this horrific crime.  It's so violating to know

10   what he took from me and gave away to anyone who wanted it.  I

11   survived these crimes but the impact will live on with me

12   forever.  I feel fortunate to be standing in front of you

13   today, capable of reading this statement when so many other

14   victims are unable to do so.  I stand here not only for me but

15   for every girl who he tried to break.

16          I do not forgive him for his crimes and I wish for

17   the maximum punishment to be considered during sentencing.

18   Thank you.

19          **THE COURT:**  Is that our last -- no, so this is

20   (indisc.).

21          **MS. SPEAKER:**  Good morning, Your Honor.  May I take

22   my mask off?

23          **THE COURT:**  You may.

24          **MS. SPEAKER:**  Thank you.  I'm sorry.  Like everyone

25   else in this courtroom today, I deserved a normal childhood.

1  We all deserve a normal childhood that we can look back on with

2  fond memories and nostalgia.

3          However, my adolescent years were instead filled with

4  struggle and damage.  As a child, I was sexually, mentally, and

5  verbally abused by my family and acquaintances from a very

6  young age.  I had a very rough life growing up.  Yes, I did

7  well in school and I had some friends, even though I found it

8  hard to build relationships.  And I had a somewhat positive

9  outlook on life.

10          In the summer of 2010, I was heading into seventh

11  grade, a young child with dreams and aspirations that one day I

12  could find a way out of my terrible situation.  I turned to the

13  internet as a refuge, where I was finding new friends and

14  reading about interesting topics for hours on end.  That summer

15  is when my initials would be written in the sexploitation

16  indictment.  Another predator on the internet has stole what

17  innocence I had left.

18          I was given a threatening command to give a show on

19  the now-defunct website Stickam dot com.  I was terrified,

20  thinking that my life was in danger and that if I didn't

21  comply, something even worse would happen to me.

22          My brain was nowhere near being fully developed.  I

23  hadn't even hit my teenage years yet.  My body and mind simply

24  went into survival mode, as it had many times before.  Hour

25  after grueling hour I was given instructions as if I were a

1    circus animal performing tricks on how to be sexy, taking my

2    clothes off, parading my naked body around, inserting my

3    fingers into my vagina to a point where I was in physical pain

4    for months after the fact, and other things a child should

5    never be doing for someone else over the internet.

6          As the seconds passed and I was continuously pushing

7    myself over the limit, I kept asking myself, when would this

8    torture end.  But that's the sad thing about trauma, it never

9    simply goes away or ends as one would hope.

10         After this terrible event occurred, my life became a

11   living Hell on earth.  The battered and beaten girl I just told

12   you about turned into an even more broken child.  I began

13   having more severe anxiety attacks, suicide attempts, and bouts

14   of PTSD.  I was constantly scared for my life.  I couldn't

15   trust anyone.  And I automatically assumed that if anyone were

16   to talk to me, they only wanted to get something out of me.  I

17   self-isolated and I couldn't sleep, eat, or focus.

18         With those feelings came a great bout of guilt and

19   shame.  I blamed myself, naïve to the fact that what the

20   Defendant did was not my fault.  I felt so guilty that I didn't

21   tell anyone, not even my family.  I was left to hold the secret

22   and just though if no one knew, it was better off that way.

23   When I slowly started to dwindle into my self-harming behaviors

24   and my long list of suicide attempts, no one truly knew why I

25   was doing it.  In fact, I remember a loved one telling me that

1   it was just a phase and that I would ultimately grow out of it.

2   To this day I have still not grown out of it.

3          When my mother eventually found out when the FBI came

4   to our house for the initial interview, I was disowned and

5   looked down upon.  I was told by her that you shouldn't have

6   been doing the things you were doing.  And I was even punished

7   for months on end after, not even being allowed to go outside

8   and be a kid the way I should have been able to to begin with.

9          Eventually word spread throughout the family, and

10  from that day forward I was looked as a sexual deviant when in

11  fact I was the victim.

12         The Defendant is the one to blame, while I have had

13  to carry this flag and support myself on my own.

14         Sorry.  What glimmer of hope I had to have a normal

15  childhood was stolen from me because of this.  I no longer had

16  friends or a positive outlook on life.  As a direct result of

17  this heinous crime, I spent seven months in in-patient mental

18  health facilities due to numerous suicide attempts over the

19  span of eight years, one of which I was almost successful.  I

20  lost touch with reality and felt like I had lost all control.

21         Due to the facilities being so high-priced, I also

22  put my family into heavy debt, a debt that still follows me to

23  this day.  And now that I'm an adult, my husband and I have to

24  self-pay for therapy appointments that haven't stopped since I

25  was 13 years old.  On top of all the other emotions that I've

1  lived with since the sextortion, I now feel as if I am a burden

2  due to the financial side of things as well.

3        I cannot hold down a steady job because my anxiety is

4  so bad.  And most nights I cannot sleep well because of the

5  PTSD, nightmares, and tremors, and sometimes even paranoid

6  delusions and hallucinations that I get when I am simply

7  overwhelmed.  Most of my hallucinations stem from not feeling

8  safe and that someone is out there to hurt me or that they have

9  the photos that I had to identify myself in when I was 13 years

10  old.

11        I fear that I cannot function as a good citizen of

12  this society because I feel like I have to constantly look

13  behind my back, or delete my social media because someone else

14  will try to do this to me again, or that when I speak, no one

15  will take me seriously because he did not take me seriously.

16  He saw me as a target and ran with it, intimidating me and

17  pushing me into a corner that I cannot pull myself out of.

18        Out of all of my traumatic experiences, this one

19  sticks with me the most; maybe because for so long I could

20  never put a face to a name or even know who the Defendant was.

21  I felt as if I had raped my own body at the beckoning call of a

22  pedophile.  To this day I still feel so dirty, as if I had

23  taken a million showers and the dirt wouldn't come off my body.

24  The Defendant quite frankly has ruined me.

25        Sitting behind a computer screen to anonymously

27

1   blackmail children into doing explicit things is inexcusable.

2   I cannot wrap my head around why someone would have such a

3   motive to commit such a heinous crime.

4         Eleven years of waiting and receiving information

5   from the FBI left me with constant reminders that this would be

6   a very long and stressful process, taking up around half of my

7   life.

8         The process came with reminders that I am a victim,

9   that this did happen to me, and not just to me but to others as

10  well.  It tears me apart because I know that no matter what I

11  do, these memories will stick with me forever.  There are so

12  many of us who have fallen victim to the Defendant, most of

13  which are not in this courtroom today.  I simply cannot forgive

14  nor will I forget.

15        Although I am now 23 years old and still dealing with

16  the impact of this traumatic event, I can now hope to find the

17  strength I need to heal and move forward.  It will continuously

18  be a battle for me but I am thankful I can use my voice to

19  stand up for myself and finally tell my truth.  Not only am I a

20  victim but I am a survivor.  A little girl has grown up and

21  that little girl is now a strong woman.

22        This will forever be an uphill battle for me but I

23  hope today that I can find peace in knowing that the Defendant

24  will get the maximum sentence for his devastating crimes.

25  Thank you.

1          **THE COURT:**  Wendy, you said IT's here.  I think IT is

2   here.  Let's see if we can get the system fixed.

3          **MS. RICHMOND:**  Thank you, Your Honor.  Would you like

4   me to keep my mask on or may I take it off?

5          **THE COURT:**  Please take -- please keep it on.

6          **MS. RICHMOND:**  Yes, Your Honor.  Defendant, Elad

7   Gaber, callously and systematically sextorted more than 40

8   girls to self-produce child pornography for him.  The impact on

9   the victims was devastating, as Your Honor has seen, lasting

10  now for more than a decade.

11          Today, in making my argument for the Government's

12  sentencing recommendation, I will explain how the Defendant's

13  sextortion scheme was calculating and relentless.  I will show

14  how Defendant would exact brutal revenge on those who did not

15  comply, as Your Honor just heard from one of the victims.  I

16  will explain how Defendant's conduct was not just limited to

17  the charges in the indictment but also included training other

18  pedophiles on how to sextort girls and stalking his neighbors

19  and trading child pornography with other pedophiles.

20          Despite all this, Defendant had and has no genuine

21  remorse.  His actions had severe consequences to the victims,

22  as Your Honor has heard, and there's a few statements at the

23  end of this PowerPoint presentation as well.

24          I'll begin with sextortion.  Understanding how

25  thorough Defendant's scheme was demonstrates his culpability

1    and the seriousness of his offense under 3553.  His sextortion

2    scheme would begin with obtaining.  He would obtain what he

3    viewed to be a potentially embarrassing or compromising file of

4    the victims.

5                This individual depicted is a minor listed in the

6    indictment.  In this case, this was the only embarrassing

7    material on her.  She had accidentally left her webcam on after

8    chatting with a friend and the webcam caught her in her

9    underwear.  It was this short, simple, and non-sexual video

10   that Defendant used to destroy her life.

11               You heard from one of the victims today.  The only

12   material Defendant had on her when she was just 12 years old

13   and barely pubescent was a video of her and her best friend

14   where she was wearing a bikini and her best friend was clothed,

15   wearing undergarments of a bra and underpants.

16               After Defendant would obtain this potentially

17   compromising material, he would locate the victims on Facebook.

18   Once he had located the victim, he would mine their public

19   profile for their contacts, and he would meticulously save

20   every contact he could.  Once he had the contacts, he would

21   make his initial contact and threat with the victim.  He had,

22   Your Honor, an exact script that he would use over and over and

23   over again.  And he used the script because it was time-tested

24   and effective.

25               He would start by informing the victim that he had

1    found compromising material of her.  He would tell her to click

2    and link and watch it, and he would in fact embed a link that

3    did contain the ability to see that compromising image.  After

4    that, he would inform her that he had stalked her and he had

5    mined her personal information and saved her entire friends

6    list.  And in case that wasn't threatening enough, he would

7    explicate, including your family, dad, and mom, and your real

8    life friends.

9            After that, Defendant would include a link to a

10   screen capture of what he had done to previous victims,

11   including often the aftermath of victims who did not comply so

12   that the victims would understand that his threats were not

13   hypothetical and they were not empty.  He would execute them

14   with vengeance if they did not comply.

15           He would try to mitigate his own actions by saying

16   things like, I'm only trying to get you on cam for myself, as

17   if somehow that minimized the impact of forcing these girls to

18   create child pornography of themselves.

19           He also tried to make himself feel better by saying,

20   I'm not really here to ruin your life.  But as Your Honor just

21   heard from the mouths of the victims theirselves (sic), it did

22   ruin their lives.  A decade later they are still living with

23   their trauma.

24           Again he would reiterate his threat to make it clear

25   that he was serious.  And, finally, he would torment and mock

1    the girls by saying thousands of people will see your video,

2    I'll post it using your full Facebook, your mobile number or

3    cellphone number, your AIM, which was a messaging platform

4    popular at the time, and everything to let the girls know that

5    not only would he distribute their child pornography, he would

6    link it to them as distinguishable, identifiable individuals

7    who then could be harassed by others.

8            You heard one of the victims say one of his common

9    phrases was if you will only please my desire; again, a

10   mitigation of what he was doing, which had the opposite impact

11   on the victims.

12           Girls would often beg and plead not to do what the

13   Defendant wanted them to do.  This is victim A.P.  She's listed

14   in the indictment and she's the victim I showed earlier in her

15   underwear.  She told Defendant that she had to babysit her

16   younger siblings.  And in one of the child pornography clips

17   the Government has prepared for the Court today, which

18   Defendant saw during a reverse proffer, you can hear A.P.'s

19   siblings crying and screaming in the background for her as she

20   is in her room being forced to rape herself to please

21   Defendant's desire.

22           A common tactic, as this Court knows, of pedophiles

23   is to seek out vulnerable children.  As you've heard from at

24   least one victim today, many of these girls were already

25   suffering great difficulties in their life.  The Defendant

1   preyed upon and took advantage of their vulnerabilities.  Here,

2   A.P. told Defendant, I already have a horrible life.  She said

3   she didn't want to worry when she was in school because she

4   cared about her grades.  But Defendant didn't care; he

5   continued.

6           Victims would often protest, sometimes lying saying

7   they had a parent in law enforcement or that their web camera

8   was broken, or that they were in trouble with their parents and

9   they wouldn't be able to comply.  In those cases, Defendant was

10  brutal, he was relentless and ruthless in scaring the victims

11  into giving him exactly what he wanted, which was child

12  pornography.  I have just a few examples for the Court.  "If

13  you don't, I'm sending the video to your dad and everyone else,

14  and that's going to be worse than talking to me."  "Here, I

15  just sent one to a random guy on your list," and we have the

16  evidence, Your Honor, that Defendant did in fact revenge

17  distribute child pornography in this case.

18          And finally, Your Honor, right here where my cursor

19  is:  "You want to stop me before I post the video to your

20  entire friend list, you better log on to AIM or message me back

21  here.  If I don't hear from you, I'm starting to post the

22  video, fool."  It's an utter disrespect and contempt for the

23  victims as he tries to scare them.

24          As I showed Your Honor before, part of the initial

25  step of this process was to mine the girls' public profiles for

1    their contact list.  And using that, he would send them emails

2    just like this with every single one of their contacts and then

3    begin to distribute them to individuals one-by-one on the list

4    to force the girls to give them what they want -- what he

5    wanted.

6            If you notice, Your Honor, where my cursor is here,

7    as to Defendant's knowledge of what he was doing, he was

8    completely aware.  These are his own words:  "Your life will be

9    ruined."  He was not unaware of the consequences that he would

10   have on other people.  Although he might suffer from autism,

11   his own words tell you that he understood the impact this would

12   have on the victims and chose to proceed forward anyways.

13           After he would scare them, he would take from them

14   their innocence, their vulnerability, and their bodies.  He

15   stole the identity of this young boy who I believe is actually

16   present via Zoom today.  It took Agent Korami nine years to

17   find this boy.  By the time we found him, he was a full grown

18   man with no knowledge whatsoever that his images had been used

19   by Defendant.  He was absolutely devastated and angry to learn

20   that his images had been used to sextort dozens of children.

21           This, Your Honor, is a video clip I have permission

22   to play.  It's very brief, and it shows the beginning of how

23   this extortion would begin.  This is one of the victims in the

24   indictment, R. J.  This is the initial conversation between R.

25   J. and Defendant.  And as you'll see, because this is a screen

34

1    capture Defendant took of his own criminal conduct as he was

2    executing it, he uploads the stolen video of that boy so that

3    these 12-year-old girls who are barely pubescent believe that

4    they're chatting with a boy of a similar age.

5           Once the video is uploaded, you'll see that the

6    victim was sophisticated enough to act -- ask him to interact

7    with her live to demonstrate that he was a real person.  But

8    having been caught, Defendant simply reverted to what he does

9    best, which was threaten the victims, and he told them, you're

10   in no position to ask me to do anything.  For the sake of

11   brevity, Your Honor, since I've described the video, I'll move

12   on.  But that's what the victim asked him to do.

13          Your Honor, I'm only going to show very brief clip of

14   this next video.  This again is a screen capture Defendant took

15   of his own criminal conduct and saved on his computer.  What

16   you see here in the background is the end image of a live video

17   chat Defendant had with the victim where he forced her to

18   produce child pornography.  You will see that Defendant drags

19   the typed conversation he was having with this victim

20   simultaneously where he was giving her directions and feedback

21   and scrolls through it so he can save a record of what he

22   forced her to do.  (Indisc.) you want to fast-forward on this.

23   The bar is in here.  It's okay.

24          Your Honor, in that video, I apologize, the bar to

25   scroll forward did not appear for an unknown reason.  But the

1    Defendant says things like, "pull harder," "show me your

2    pussy," "make it wider."  He instructs her to lift her legs

3    back, to bend her knees harder.  When she says that her mother

4    has come home and she's late for work, he says, I don't care, I

5    still have you for 15 more minutes.

6             After he would take the girls' bodies and produce the

7    child pornography, he meticulously curated his enormous

8    collection of child pornography.  We found on two separate

9    digital devices numerous individually labeled folders with the

10   victims' full first and last names.  In those folders, there

11   was individual sub-folders containing information taken from

12   their public profile picture, such as their contact lists, the

13   blackmail Defendant had perpetrated on them, as well as their

14   child pornography.

15            Your Honor, the Government has successfully

16   identified 41 individual victims of production of child

17   pornography and extortion.  In addition to that, there is at

18   least a dozen other victims of child pornography that we were

19   unsuccessful in identifying.

20            Even worse, there was a folder with approximately a

21   hundred other individuals that Defendant had begun the initial

22   stages of collecting the information from Facebook on.  And I

23   think it's a safe assumption that he would have perpetrated the

24   scheme on those girls as well had the FBI not stopped him.

25            And this is an example, Your Honor, of one of the

1  victims' folders open with all of the files he saved of her,

2  including numerous curated screen captures from the video he

3  got of her, meaning he didn't just record the video, he went

4  back, he watched it again, and he created individual files of

5  it.

6           That wasn't enough for Defendant, though.  After he

7  curated his collection of child pornography, he would often

8  gloat to the victims about what he had done.  This is the end

9  conversation of a clip I showed you earlier with a young girl,

10 R. J. with red hair, where he brags that he's not really 16 and

11 it wasn't really the boy that they thought that they were

12 seeing, and they should be more careful.  Your Honor, that was

13 the sextortion portion of the Government's argument.

14          I'll now move on to revenge which was a different

15 kind of harm Defendant exacted and which you heard from one of

16 the victims here created an equal amount of harm.  If girls did

17 not agree to get on Stickam and produce child pornography

18 according to the Defendant's exact script, he would post their

19 previous compromising material to all of their friends on

20 Facebook, including often their parents.  And unlike the two

21 victims I showed you, whose compromising material was really

22 not compromising at all, many of these girls did have videos

23 where they were masturbating, which is child pornography, and

24 he distributed it widely and frequently in a vengeful manner.

25          Again, he showed no remorse for his victims.  "Fuck

you, you dumb idiot."  He did not show any respect for their human life or their privacy.

Part of Defendant's scheme was to create dozens of Facebook accounts to continue his campaign of harassment.  For one of the victims listed in the indictment, E. A., he created 17 different Facebook profiles specifically just for her to coerce her to produce more child pornography.  Again, he sent it to many peoples' parents.

Defendant took great pride in training other pedophiles on how to sextort exactly how he did.  And helpfully, and this is verbatim from his own words, he had a file saved on his digital devices called:  Guide dash how to blackmail.  This folder was filled with hundreds of screen captures that he had taken of his successful sextortions of girls.  I have added the redactions but everything else you see on this screen is something that Defendant made himself.

So on the left is a picture that the victim posted of herself on her profile.  And on the right is an image taken from a child pornography video of her after she had been extorted.  The victim tried to deny it was her, and Defendant pointed out that she was wearing the same necklace in both her profile picture and the child pornography video and therefore could not deny that it was her.

This is another self-created screen capture that Defendant has made in which he shows the devastating aftermath

38

1   of his distribution of child pornography.  The red highlights

2   you see he added where a victim says he's a pro, this guy is a

3   pro at this and this guy is really bad.

4           And here's just one other screen capture to give Your

5   Honor an example of the types of images he saved of his

6   devastating distribution of child pornography.

7           In addition, in his email, the FBI found credible

8   evidence that he was starting to or already had created a

9   platform where pedophiles could share their sextorted material.

10  And in fact, in that email account we found emails from actual

11  people who had sent screen captures of similar sextortions

12  asking to become a part of his trading ring.

13          Your Honor, a question that's frequently asked of the

14  Government in these cases is did Defendant touch the victims.

15  And the answer is no.  I think as Your Honor has seen, that

16  created no less devastating impact.

17          But in case the Court is concerned that he's someone

18  who would always stay at home and never go outside, we already

19  know that's not true.  Before Defendant was extradited here, he

20  was stalking his neighbors, taking surreptitious photos of them

21  inside their homes during their most private moments, including

22  once in his neighbors engaging in sex, and also took a picture

23  of one of his minor neighbors.  So the Court knows that he's

24  not just limited to the confines of his home and he presents a

25  real danger to real people.

39

1          Defendant showed absolutely no remorse.  He says

2     repeatedly that he has no fear of the police because he's not

3     American, he's on the other side of the ocean.  He doesn't care

4     about cyber police.  And he told some of the victims that if

5     they dared to report it to the police, the police would say,

6     move along, slut, we have real crimes to deal with here.

7     Defendant thought he would never be captured and frequently

8     told his victims this.

9          But Defendant was captured.  And, again, to show the

10    lack of remorse, Defendant said during an investigation --

11    during an interrogation, excuse me, with Israeli law

12    enforcement that, so what, she did it for a thousand and now

13    another 20 will see.  But maybe it's someone who cares more, so

14    what, nonsense.  He truly believed that what he was doing was,

15    as he says in the next line, not exactly wonderful but it's his

16    right.  He showed zero remorsefulness for the impact on the

17    victims, which speaks to the high likelihood that he will

18    recidivate again.

19          And in case Your Honor was wondering, he knew that

20    these girls were victims.  He said during this interrogation in

21    response to a question about how did you know they were minors,

22    face, clothes, ways of behaving, there's clues.  So he knew

23    that these girls were underage and he chose to victimize

24    children anyways.

25          Your Honor, I'd like to end the Government's

1  sentencing argument with the impact on the victims by showing

2  just a few brief videoclips.  This is victim C. T. who's listed

3  in the indictment, and this is what her face looked like as she

4  initiated the Stickam session with Defendant and realized what

5  was about to happen to her.  As you can tell, these are not

6  young children having fun.  They're not engaging willingly.

7  This is C. T. after she was forced to produce child

8  pornography.

9           Your Honor, one of these victims who's listed in the

10  indictment as C. B. spoke today, and this is a clip from the

11  video that Defendant produced of her and R. J., who's listed in

12  the indictment with her.  As you can tell, Your Honor, these

13  are just young, barely pubescent girls who as it was happening

14  were not having fun and were devastated and crying.  I have

15  only two more clips after this, Your Honor, and then I'll

16  conclude.

17           The same victim who addressed you today last, Your

18  Honor, who's listed in the indictment as C.B., spoke with the

19  FBI as she mentioned, and this was her response when she was a

20  child.

21      **(Begin playing video clip at 11:22 a.m.)**

22           **MS. RICHMOND:**  In case the Court couldn't hear, she

23  said, "I just feel very violated."

24      **(Stop playing video clip at 11:22 a.m.)**

25           **MS. RICHMOND:**  And this is the last clip, Your Honor.

1    **(Video clip played from 11:22 a.m. to 11:23 a.m.)**

2        **MS. RICHMOND:**  That was victim HSF in the indictment.

3    But the women who spoke to you today and the girls whose clips

4    I just showed were not Defendant's only victims.  This map

5    shows from a geographic perspective the broad destruction that

6    he swept across the United States, despite the fact that he was

7    an ocean away.

8        Your Honor, the women who spoke today were not the

9    only victims who were impacted by this case.  There were dozens

10   of victims who could not face Defendant today, who were too

11   scared or who weren't strong enough.  But they were no less

12   impacted by his crimes.

13       The United States has indeed requested a very high

14   sentence, Your Honor, an unusually high sentence.  But when the

15   Court considers the number of victims Defendant had and the

16   incredibly devastating consequences he inflicted in their

17   lives, knowing what he was doing, and callously,

18   systematically, and relentlessly pursuing forward, a 30-year

19   sentence is just and reasonable under the 3553(a) factors.

20       Your Honor, the only other thing I wanted to put

21   before the Court is that pursuant to BOP rules, United States

22   statutes, and the MLAT, the only time for which Defendant can

23   be credited for good time served is time served after he was

24   under the arrest of an American warrant.  And I can confirm

25   with my agent how long that was but I believe it was only 21

42

1    days.  But he certainly does not deserve credit that he spent

2    in Israeli custody on an Israeli criminal offense.

3            And unless the Court has questions, I submit.

4            **THE COURT:**  There is also a request for restitution.

5    It's a very general request of $135,000.  I think the Court

6    needs more explicit information.  I'm not sure if you want a

7    deferred restitution hearing or work on a stipulation, but it

8    just seems that the blanket statement isn't enough for me to

9    render a judgment of $135,000.  Is there any way to collect

10   paperwork or declarations?  There was some statements today

11   about debt and fees.  Some way to project --

12           **MS. RICHMOND:**  I completely understand, Your Honor.

13   I did try to collect those documents before this hearing.  But

14   if it's acceptable to the Court I would appreciate putting a

15   restitution hearing out.  And I can reemphasize to the victims

16   how important it is to submit paperwork and a declaration if

17   they'd like to be awarded restitution.

18           **THE COURT:**  Any objection, Mr. Werksman, to a

19   deferred restitution hearing?

20           **MR. WERKSMAN:**  No, Your Honor.

21           **THE COURT:**  All right.  Thank you.

22           **MS. RICHMOND:**  Thank you, Your Honor.

23       **(Pause)**

24           **THE COURT:**  I find the report to be accurate and

25   correct.  I adopt the report and the calculation of the

43

1  advisory sentencing guidelines.  The advisory guidelines are

2  the starting point in the Court's analysis.  I am consulting

3  and taking into account the November 1st, 2021 edition of the

4  guidelines.

5           The Total Offense Level is 29.  The Criminal History

6  Category is one.  The guideline range for custody is the

7  mandatory minimum of 120 months.  The guideline range for

8  supervised release is five years to life.

9           The guidelines range for the fine is 15,000 to

10  $150,000.  And the special assessment to the Crime Victims Fund

11  is a hundred dollars.

12           I am also considering the factors described in Title

13  18, United States Code, Section 3553(a), especially but not

14  exclusively:  one, the nature and circumstances of the offense

15  and the history and the characteristics of the Defendant; two,

16  the need for the sentence to reflect the seriousness of the

17  offense, to promote respect for the law, and to provide for

18  just punishment; (b) to afford adequate deterrence for criminal

19  conduct; (c) to protect the public from further crimes of the

20  Defendant; and (d) to provide the Defendant with needed

21  educational or vocational training, medical care, or other

22  correctional treatment in the most effective manner; three, the

23  kinds of sentences available; four, the guideline sentencing

24  range; five, any pertinent policy statement issued by the

25  United States Sentencing Commission; six, the need to avoid

44

1    unwarranted sentence disparities; and, seven, the need to

2    provide restitution to the victims of the offense.  I will now

3    state the sentence but the attorneys will have a final chance

4    to make legal objections before sentence is imposed.  Does

5    either counsel know of any reason why sentence should not now

6    be pronounced?

7            **MS. RICHMOND:**  Not from the Government, Your Honor.

8            **MR. WERKSMAN:**  No, Your Honor.

9            **THE COURT:**  I find that the following sentence is

10   reasonable and is sufficient but no greater than necessary to

11   comply with the purposes stated in Title 18, United States

12   Code, Section 3553(a).  It is ordered that the Defendant shall

13   pay to the United States a special assessment of $100, which is

14   due immediately.  Any unpaid balance shall be due during the

15   period of imprisonment at a rate of not less than $25 per

16   quarter and pursuant to the Bureau of Prisons Inmate Financial

17   Responsibility Program.  The special assessment pursuant to the

18   Justice For Victims of Trafficking Act of 2015 is waived as the

19   Defendant is found to be indigent.

20            Pursuant to section -- Title 18, United States Code,

21   Section 3664(d)(5), a final determination of the victims'

22   losses will be ordered at a deferred restitution hearing, after

23   such information becomes available.  An amended judgment will

24   be entered after such determination.  Restitution shall be due

25   during the period of imprisonment at a rate of not less than

$25 per quarter, and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.  If any amount of restitution remains unpaid after release from custody, nominal payments of at least ten percent of the Defendant's gross monthly income but not less than $25, whichever are the greater, shall be made during the period of supervision and shall begin 90 days after the commencement of supervision.  Nominal payments are ordered as the Court finds the Defendant's economic circumstances do not allow for immediate or future payment of the amount ordered.

If the Defendant makes a partial payment, each payee shall receive approximately proportional payment unless another priority order or percentage payment is specified in the judgment.

Pursuant to Title 18, United States Code, Section 3612(f)(3)(A), interest on the restitution ordered is waived because the Defendant does not have the ability to pay interest.  Payments may be subject to penalties for default and delinquency pursuant to Title 18, United States Code, Section 3612, subpart "G."

The Defendant shall comply with Second Amended General Order 20-04.

Pursuant to guideline section 5E1.2(a), all fines are waived as the Court finds that the Defendant has established that he is unable to pay and is not likely to become able to

1   pay any fine.

2          The Court recommends that the Bureau of Prisons

3   conduct a mental health evaluation of the Defendant and provide

4   all necessary treatment.

5          Pursuant to the Sentencing Reform Act of 1984, it is

6   the judgment of the Court that the Defendant, Elad Gaber, is

7   hereby committed on Count Ten of the indictment to the custody

8   of the Bureau of Prisons for a term of 30 years, or 360 months.

9          Upon release from imprisonment, the Defendant shall

10  be placed on supervised release for a term of life under the

11  following terms and conditions.  One, the Defendant shall

12  comply with the rules and regulations of the United States

13  Probation Office and Pretrial Services Office and Second

14  Amended General Order 20-04, including the conditions of

15  probation and supervised release set forth in section three of

16  the Second Amended General Order 20-04.

17         Two, the Defendant shall not commit any violation of

18  local, State, or Federal laws or ordinance.

19         Three, during the period of community supervision,

20  the Defendant shall pay the special assessment and restitution

21  in accordance with this judgement order pertaining to such

22  payment.

23         Four, the Defendant shall comply with the Immigration

24  rules and regulations of the United States.  And if deported

25  from this country either voluntarily or involuntarily, not

47

1   reenter the United States illegally.

2          The Defendant is not required to report to Probation

3   and Pretrial Services while residing outside the United States.

4   However, with 72 hours of release from any custody or any

5   reentry to the United States during the period of court-ordered

6   supervision, the Defendant shall report for instructions to the

7   United States Probation Office located at 300 North Los Angeles

8   Street, Suite 1300, Los Angeles, California 90012.

9          Five, the Defendant shall not obtain or possess any

10  driver's license, Social Security number, birth certificate,

11  passport, or any other form of identification in any name other

12  than the Defendant's true legal name, nor shall the Defendant

13  use any name other than the Defendant's true legal name without

14  the prior written approval of the probation officer.

15         Six, the Defendant shall cooperate in the collection

16  of a DNA sample from the Defendant.

17         Seven, a judgment -- the Defendant shall apply all

18  monies received from income tax refunds, from lottery winnings,

19  inheritance, judgments, and any other financial gains to the

20  court-ordered financial obligation.

21         Eight, the Defendant shall participate in mental

22  health treatment which may include evaluation and counseling

23  until discharged from the program by the treatment provider

24  with the approval of the probation officer.

25         Nine, as directed by the probation officer, the

1  Defendant shall pay all or part of the cost of the court-

2  ordered treatment to the aftercare contractors during the

3  period of community supervision.  The Defendant shall provide

4  payment and proof of payment as directed by the probation

5  officer.  If the Defendant has no ability to pay, no payment

6  shall be required.

7          Ten, within three days of release, the Defendant

8  shall register as a sex offender and keep the registration

9  current in each jurisdiction where the Defendant resides, is

10  employed, and is a student, pursuant to the registration

11  procedures that have been established in each jurisdiction.

12          When entering for the first time, the Defendant shall

13  also register in the jurisdiction in which the conviction

14  occurred if different from the Defendant's jurisdiction of

15  residence.  The Defendant shall provide proof of registration

16  of the -- to the probation officer within 48 hours of

17  registration.

18          Eleven, the Defendant shall participate in a

19  psychological counseling or psychiatric treatment or sex

20  offender treatment program, or any combination thereof, which

21  may include in-patient treatment, upon order of the Court as

22  approved by the -- and directed by the probation officer.  The

23  Defendant shall abide by all rules, requirements, and

24  conditions of such program, including submission to risk

25  assessment evaluations and psychological testing, such as

49

1   polygraph and (indisc.) testing.  The Defendant retains the

2   right to invoke the Fifth Amendment.

3          Twelve, as directed by the probation officer, the

4   Defendant shall pay all or part of the cost of psychological

5   counseling or psychiatric treatment or a sex offender treatment

6   program, or any combination thereof to the aftercare contractor

7   during the period of community supervision.  Under Title 18,

8   United States Code, Section 3672, the Defendant shall provide

9   payment and proof of payment as directed by the probation

10  officer.  If the Defendant has no ability to pay, no payment

11  shall be required.

12         Thirteen, the Defendant shall not view, possess any

13  materials, including pictures, photographs, books, writings,

14  drawings, videos, or videogames depicting or describing child

15  pornography as defined in Title 18, United States Code, Section

16  2256, subpart "A," or sexually explicit conduct depicting

17  minors as defined in Title 18, United States Code, Section

18  2256(2).

19         The Defendant shall not possess or view any materials

20  such as videos, magazines, photographs, computer images, or

21  other matter that depicts activity -- actual sexually explicit

22  conduct involving adults as defined by Title 18, United States

23  Code, Section 2257(h)(1).  This condition does not prohibit the

24  Defendant from possessing materials solely because they are

25  necessary to and used for in collateral attack, nor does it

1   prohibit the Defendant from possessing materials prepared and

2   used for the purposes of the Defendant's mandated sex offender

3   treatment when the Defendant's treatment provider or probation

4   officer has approved of the Defendant's possession of the

5   material in advance.

6          Fourteen, the Defendant shall not contact the victims

7   by any means, including in person, by mail or electronic means,

8   or via third parties.  Further, Defendant shall remain at least

9   100 yards from the victims at all times.  If any contact

10  occurs, the Defendant shall immediately leave the area of

11  conduct and report the conduct -- contact to the probation

12  officer.

13         Fifteen, the Defendant shall not enter, loiter within

14  a hundred feet of schoolyards, parks, public swimming pools,

15  playgrounds, youth centers, video arcade facilities, amusement

16  or theme parks, or other places primarily used by persons under

17  the age of 18 without the prior written authorization of the

18  probation officer.

19         Sixteen, the Defendant shall not associate or have

20  any verbal, written, telephonic, or electronic communications

21  with any persons under the age of 18 except:  (a) in the

22  presence of the parent or legal guardian of said minor and (b)

23  on the condition that the Defendant notifies said parent or

24  legal guardian of this conviction in the instant offense and

25  the prior offense.  This provision does not encompass persons

1  under the age of 18, such as waiters, cashiers, ticket vendors,

2  etcetera whom the Defendant must interact with in order to

3  obtain ordinary and usual commercial services.

4       Seventeen, the Defendant shall not affiliate with,

5  own, control, volunteer, or be employed in any capacity by a

6  business or organization that causes the Defendant to regularly

7  contact persons under the age of 18.

8       Eighteen, the Defendant shall not affiliate with,

9  own, control, or be employed in any capacity by a business

10 whose principal product is the production or selling of

11 materials depicting or describing sexually explicit conduct as

12 defined in Title 18, United States Code, Section 2256(2),

13 subpart two.

14      Nineteen, the Defendant shall not own, use, or access

15 the services of any commercial mailbox, mail receiving agency,

16 nor shall the Defendant open or maintain a post office box

17 without the prior written approval of the probation officer.

18      Twenty, Defendant's employment shall be approved by

19 the probation officer, and any change in employment must be

20 preapproved by the probation officer.  The Defendant shall

21 submit the name, address of the proposed employer to the

22 probation officer at least ten days prior to any scheduled

23 change.

24      Twenty-one, the Defendant shall not view or possess

25 any materials, including pictures, photographs, books,

1  writings, drawings, videos, or videogames depicting or

2  describing child erotica, which is defined as a person under

3  the age of 18 in partial or complete state of nudity in

4  sexually provocative poses viewed for the purpose of sexual

5  arousal.

6        Twenty-two, the Defendant shall not reside within

7  direct view of schoolyard, public park, swimming pool,

8  playgrounds, youth centers, video arcades, facilities, or other

9  places used primarily by persons under the age of 18.  The

10  Defendant shall -- the Defendant's residence shall be approved

11  by the probation officer, and any change in the residence must

12  be preapproved by the probation officer.  The Defendant shall

13  submit the address of the proposed residence to the probation

14  officer at least ten days before any scheduled move.

15        Twenty-three, the Defendant shall submit his person,

16  property, house, residence, vehicle, papers, computers,

17  cellphones, other electronic communications, or data storage

18  devices or media email accounts, social media accounts, cloud

19  storage accounts, or other areas under the Defendant's control

20  to search conducted by a United States probation officer or law

21  enforcement officer.  Failure to submit to a search may be

22  grounds for revocation.  The Defendant shall warn any other

23  occupants that the premises may be subject to searches pursuant

24  to this condition.  Any search pursuant to this condition will

25  be conducted at a reasonable time, in a reasonable manner upon

1  a reasonable suspicion that the Defendant has conducted a

2  violation a condition of his supervision and that the areas to

3  be searched contain evidence of this violation.

4          Twenty-four, failure to submit to a search may be

5  grounds for revocation.  The Defendant shall warn any other

6  occupants that the premises may be subject to searches pursuant

7  to this condition.  Any search pursuant to this condition will

8  be conducted at a reasonable time and in a reasonable manner

9  under reasonable suspicion that the Defendant has violated a

10  condition of supervision, and that the areas to be searched

11  contain evidence of this violation.

12          Twenty-five, the Defendant shall possess and use only

13  those computers and computer-related devices, screen user

14  names, passwords, email accounts, and internet service

15  providers, social media accounts, messaging applications, and

16  cloud storage accounts that have been disclosed to the

17  probation officer upon commencement of supervision.  Any

18  changes or additions are to be disclosed to the probation

19  officer prior to their first use.  Computer and computer-

20  related devices include personal computers, internet

21  appliances, electronic games, cellular telephones, digital

22  storage media, and the peripheral equipment that can access or

23  can be modified to access the internet, electronic bulletin

24  boards, and other computers.

25          Twenty-six, all computers, computer-related devices,

54

and their peripheral equipment used by the Defendant shall be subject to seizure, search, seizure, and computer monitoring. This shall apply -- shall not apply to items used at the employment site that are maintained and monitored by the employer.

Twenty-seven, the Defendant shall comply with the rules and regulations of the computer monitoring program.  The Defendant shall pay the cost of the computer monitoring program in an amount not to exceed $32 per month per device connected to the internet.

The Court authorizes the probation officer to disclose the Presentence Report and the previous mental health evaluations to the treatment provider.  The treatment provider may provide information, excluding the Presentence Report, to State or local social services agencies for the purposes of the client's rehabilitation.  The drug testing condition mandated by statute is suspended on the Court's determination that the Defendant poses a low risk for future substance abuse.

The Court has given the above guideline sentence based on the nature and circumstances of this offense as outlined by the Government in its presentation and in its papers, along with the summaries in the factual basis and in the Presentence Report.

You're remanded to the custody of the United States Marshals.  Does counsel have anything further?

55

1          **MS. RICHMOND:**  Your Honor, the United States moves to

2   dismiss the remaining counts of the indictment.

3          **THE COURT:**  The remaining counts are dismissed.

4          **MR. WERKSMAN:**  Your Honor, may I request that the

5   Court order that the Defendant be given credit for time served

6   for any custody that he served from August 15, 2014 forward?

7   Because that's the date when the United States government

8   issued an indictment through a grand jury here in the Central

9   District.  Specifically, he was arrested in Israel on December

10  27, 2017 and spent 21 days in actual custody before being

11  released on January 17, 2018 on house arrest with electronic

12  monitoring and supervision.  He thereupon served 745 days in

13  house arrest and with the electronic monitoring, until January

14  22nd, when he was taken -- of 2020 when he was taken back into

15  actual custody, transported here, and he's been in continuous

16  custody of the United States Marshal since January 22nd, 2020.

17         **THE COURT:**  I'll leave the calculation of the credits

18  to the Bureau of Prisons.  Anything else?

19         **MR. WERKSMAN:**  No, thank you, Your Honor.

20         **THE COURT:**  The statement of reasons shall be

21  included in the commitment order and judgment and shall be

22  provided to the probation office, the United States commission

23  -- sentencing commission, to the Bureau of Prisons.  A complete

24  copy of the Presentence Report shall be provided to the Bureau

25  of Prisons and the United States Sentencing Commission.  Any

1    other copies of the report and related materials shall remain

2    confidential.

3              If an appeal is taken, counsel on appeal shall have

4    access to the report.

5              You have a right to appeal your conviction if you

6    believe that your guilty plea was somehow unlawful or

7    involuntary, or if there was some other fundamental defect in

8    the proceedings that was not waived by your guilty plea.

9              You also have a right to appeal your sentence under

10   some circumstances, particularly if you think the sentence is

11   contrary to law.  However, a defendant may waive those rights

12   as part of a plea agreement.  And you have entered into a plea

13   agreement that waives some or all of your right to appeal the

14   sentence itself.  Such waivers are generally enforceable.  If

15   you believe the waiver is unenforceable, you can present that

16   theory to the Court of Appeals.  With few exceptions, a notice

17   of appeal must be filed within 14 days of judgment being

18   entered.  Mr. Gaber, do you understand?

19             **THE DEFENDANT:**  Yes.

20             **THE COURT:**  If you are unable to afford a transcript

21   of the record in this case, one will be provided at Government

22   expense.  If you are unable to pay the cost of an appeal or

23   filing fee, you may apply within 14 days for leave to appeal in

24   forma pauperis.  If you do not have counsel to act on your

25   behalf and if you request it, the Clerk of the Court will

57

1    prepare and file a notice of appeal on your behalf.  You must

2    make that request within 14 days.  The notice of appeal must

3    designate the judgment order appealed from the fact that you

4    are appealing to the Court of Appeals.  It should designate the

5    portion of the proceedings not already on file that you deem

6    necessary for the reporter to include.

7            Anything further?

8            **MS. RICHMOND:**  No, Your Honor.

9            **MR. WERKSMAN:**  One last thing, Your Honor.  Would the

10   Court order the Bureau of Prisons to cooperate with any

11   provision under the treaty between the United States and Israel

12   for the Defendant's repatriation to Israel to serve his

13   sentence?

14           **THE COURT:**  Basically the Court -- the Bureau of

15   Prisons is obligated to follow the law, that includes the

16   treaty as well.

17           **MR. WERKSMAN:**  Thank you, Your Honor.

18           **THE COURT:**  Yeah, thank you.

19       **(This proceeding was adjourned at 11:46 a.m.)**

20

21

22

23

24

25

58

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    __October 24, 2021__

Signed                                              Dated


*TONI HUDSON, TRANSCRIBER*